STATE *vs.* THOMAS VERDE *et al.*

DECEMBER 26, 1940.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

See also 63 R. I. 389.

CONDON, J.   This is a petition for a new trial under the provisions of general laws 1938, chapter 535, § 5.   The petitioners were convicted in the superior court of conspiracy. They now complain that their trial was not full, fair and impartial, because the trial justice "secretly" sent a physician and two deputy sheriffs into the jury room while the jurors were there deliberating on their verdicts; and also because he allowed the jurors, during the trial, to send and

receive letters without any supervision of such letters by the court and without notice to the petitioners or their counsel.

The petitioners contend that the conduct of the trial justice in each instance constituted unlawful communication with the jury and *per se* vitiated their verdicts. In support of this contention, petitioners argue that it is a well-established rule of law that neither the trial justice nor anyone else is permitted to have any communication with the jury, except in open court in the presence of the parties or their counsel. And they contend further that infraction of this rule, regardless of the motive for it or its prejudicial effect on the verdict, requires a reversal and the granting of a new trial.

If the law were as the petitioners contend, they would, on the evidence before us, be entitled to a new trial. That evidence shows that there was irregular communication with the jury, both during the trial and during their deliberation on their verdicts in the jury room; that each instance of such irregular communication was permitted on order of the trial justice without notice to these petitioners and without any opportunity being afforded them to object to such communications; and finally, that the petitioners did not learn of any instance of such irregular communications with the jury until after the court had received their verdicts.

Before discussing the law applicable to such a situation, we think it will be helpful to set out in some detail the evidence upon which defendants base their claim for a new trial. That evidence discloses when the unlawful communications with the jury took place, the substance of them, and how they occurred. It is contained in affidavits which were made by the trial justice, the jurors, the officers who had the custody of the jury, counsel for the state, counsel for the petitioners, the petitioners themselves, and the physician who was admitted to the jury room. There was no objection to the admission of any of these affidavits, and in the making

of some of them counsel for the state and counsel for the petitioners cooperated. Except in some minor particulars, there is no conflict in the evidence which they present. In addition to these affidavits we also have the testimony of the assistant clerk of the superior court who administered the oaths to the officers who were specially charged with the custody of the jury.

It appears from this evidence that on March 25, 1940, the day when these petitioners were put on trial in the superior court for conspiracy, the jury was ordered "locked up" on the motion of the attorney general. Deputy sheriff Frank Verria and deputy sheriff Anthony B. McCabe were thereupon given charge and custody of the jury and they were then and there specially sworn as follows by the clerk in open court: "You severally and solemnly swear that you will keep together the jurors now about to be committed to your care, that you will allow no one to speak to them except upon order of the court, so help you God."

During the trial certain letters addressed to several of the jurors were delivered to these officers at the hotel where the jury was lodged; and certain letters were written by several jurors and mailed by the officers. Each officer states that he censored both the incoming and outgoing mail; that the letters which the jury received contained no reference whatsoever to the case; that the letters which were sent out were likewise read and found to contain no such reference; and that what each officer did in this connection was done on the order of the trial justice. Each juror who sent or received a letter or letters stated that there was no reference to the case on trial in such letter or letters and stated specifically the substance of the message contained therein, which, in every instance, referred to the social, financial or domestic affairs of the juror and was not of a disturbing nature.

The trial justice states in his affidavit concerning these letters: "I think that I originally gave no instructions about

them. I learned that letters had customarily come to them and been written by them. I found that these letters were all censored . . . . I afterward told the officers in charge that letters should not be opened except with the permission of those to whom they were addressed, but unless the permission was given the letters would be held until the case was over and not be allowed to go to the jurors."

It is fair to deduce from the affidavit of the trial justice that the officers were authorized and directed to permit the jurors to receive letters if nothing referring to the trial was found in them by such officers; and that the trial justice did not concern himself further with the matter of the receiving or sending of such letters by the jurors.

It appears from the affidavits of counsel for the petitioners that they were never advised of this action of the trial justice; that, throughout the trial, they did not know nor did they have reason to suspect that the jurors were thus communicating with persons who were outside the jury room; and that they did not learn of it until several days after the trial, when they were arguing their motion for a new trial to the trial justice. Counsel further state that they did not even then know the extent to which the practice had gone but learned of it from the affidavits which were made by the officers and jurors in the instant proceeding.

The evidence before us also shows that after the jury were charged and before they retired to deliberate upon their verdicts, the court appointed deputy sheriff Frank Verria to have charge and custody of them until they returned their verdicts; and that he was again specially sworn by the assistant clerk as follows: "You solemnly swear that you will keep together the jurors now about to be committed to your care; that you will allow no one to speak to them, nor speak to them yourself except to ask if they have agreed upon a verdict, or otherwise by order of the court, so help you God."

The jury thereupon retired at about 3 o'clock in the afternoon of April 5, 1940.

Shortly after 7 o'clock, p.m., while the jury was still deliberating, the foreman of the jury came to the door and told Verria that a juror was sick and needed a doctor. Verria, without leaving his post of duty, conveyed this message to deputy sheriff McCabe, who was within speaking distance on the next lower floor of the courthouse, and asked him to telephone to the trial justice, who was then at his home, for instructions. McCabe talked on the telephone to the trial justice, who told him to have Verria ascertain the juror's condition. McCabe communicated this instruction to Verria and, about a minute or so thereafter, Verria came back to him and told him the juror was very ill. McCabe then told the trial justice's personal officer, deputy sheriff Tomlinson, of the illness of the juror and Tomlinson called the trial justice on the telephone and conveyed to him what Verria had said to McCabe. The trial justice then informed Tomlinson that he would send a physician to the courthouse; that Verria and McCabe were to go with the physician into the jury room; that they were to instruct the physician not to talk to anyone but the sick juror, and not to discuss the case with anyone in the jury room under any circumstances.

Shortly after this telephone conversation, Dr. Ernest W. Bishop arrived at the courthouse and was met there by the trial justice, who had arrived at about the same time. The trial justice thereupon personally instructed the doctor that he was to talk to no one but the sick juror and that he was not to talk to anyone about the case. The doctor then went to the jury room accompanied by Verria and McCabe. They remained there fifteen or twenty minutes, more or less, while the doctor administered treatment to the sick juror whom he found to be suffering from indigestion. He states in his affidavit that while he was in the jury room he complied

strictly, in every respect, with the instructions of the trial justice. In this he is corroborated by Verria and McCabe and the sick juror, and there is nothing in the evidence to the contrary.

It also appears from the evidence that the sick juror, about an hour after the jury had retired and before he became ill enough to require the services of a physician, had concluded that the defendants were guilty and that he continued to hold that view; also that, at the time he became so ill as to need a doctor and after he received medical attention, he did not participate in the further deliberations of the jurors but rested on a table in the room, where he slept part of the time while his fellow jurors were still deliberating. About two and a half to three hours after the doctor left, the other jurors agreed upon verdicts of guilty and, after informing the sick juror of their conclusions, he was able to agree and did agree with them that they should all return verdicts of guilty into court, which they did.

After the verdicts of the jury were received, the trial justice then made the following statement:

"I think, for the sake of the record, I want to say that about 7:20 or thereabouts I was at my house and was called by the officer who stated that one of the jurors was sick and I told the officer to summon Dr. Bishop at once or any doctor that this juror might desire. Dr. Bishop is the house physician, I think, at the Crown Hotel, that is my reason for calling him as he had been called before in other cases. Not in any case with this particular jury. Dr. Bishop came and gave assistance to this juror. He went into the room where the jurors were and at the same time two officers who were in charge of the jury went in. But fortunately he was able to help this juror so that he recovered and apparently is all right now and was very shortly.

"Inasmuch as someone went into the jury room I feel it is proper to make this statement on the record, as I prefer the attorneys to know it and get it from the Court

rather than from any other source. I think there is nothing else that I have to say on that matter."

The petitioners and their counsel learned from this statement for the first time that the trial justice had ordered these persons to enter the jury room and had authorized the doctor to talk with the sick juror. What had been said in the jury room and whether or not the other jurors had talked with anyone or had continued their deliberations in the hearing of these persons, the petitioners did not learn until proceedings for a new trial were commenced, first in the superior court and later by the instant petition in this court, when the facts were fully disclosed by the above affidavits and testimony.

It must be obvious from the foregoing summary of the evidence that this jury was subjected to the grave danger of outside communication, which the court's order of sequestration, on the state's motion, was designed to make impossible. It is equally obvious that the solemn obligation, which the officers who had charge of the jury assumed, was not carried out according to the terms of their oaths. In each instance, however, it was the trial justice who made possible these variations from the strict requirements of the officers' sworn duties; and the question naturally arises whether or not he was warranted in making such orders in the manner in which he did.

We are of the opinion that he was not warranted in doing so; but we do not agree with the petitioners that the conduct of the trial justice necessarily vitiated the verdicts of the jury. We recognize that some courts have so held, especially in certain cases in each of which the trial justice had personally invaded the jury room or had otherwise communicated with the jurors about their verdict. *Sargent* v. *Roberts,* 1 Pick. (Mass.) 337; *State* v. *Murphy,* 17 N. D. 48; *People* v. *Linzey,* 79 Hun. 23; *State* v. *Wroth,* 15 Wash. 621; *Coolman* v. *State,* 163 Ind. 503; *Hoberg* v. *State,* 3 Minn.

262.  See also note 84 A. L. R. 230.  But other courts in similar instances have held to the contrary.  *Philips* v. *Commonwealth*, 19 Grattan (Va.) 485; *Doyle* v. *United States*, 10 Fed. 269; *Collins* v. *State*, 78 Ga. 87; *State* v. *Connelly*, 7 Mo. App. 40.  For other cases see note 34 A. L. R. 103, and also note 84 A. L. R. 234.

We have carefully examined many other cases in which this question has arisen and it appears to us that the great weight of authority is to the effect that such irregular communications with the jury do not in and of themselves vitiate the jury's verdict but do so only if the unsuccessful party has been prejudiced thereby. However, they are not in agreement as to whose duty it is to show such prejudice.  Many courts hold that the party seeking a new trial has the duty of showing that the communication created such prejudice, while others hold that the showing of the unlawful communication is *prima facie* a showing of prejudice, subject, however, to rebuttal by the party opposing the motion.

In criminal cases the latter may be the better rule; but, in view of the state of the evidence in the instant case, it is not necessary for us to decide which rule is applicable here. However, even if we give the defendants, the petitioners here, the benefit of the view that their showing of irregular and unlawful communications with the jury constituted a *prima facie* showing of prejudice, we are convinced beyond a reasonable doubt by the undisputed evidence before us that there was no actual prejudice to the substantial rights of the defendants so as to deprive them of a full, fair and impartial trial within the meaning of G. L. 1938, chap. 535, § 5.

If we take each incident separately and weigh it carefully in all its aspects most favorably to the defendants, it is difficult if not impossible to see how any harm could have come to them by means of what happened.  It is true that what occurred strongly tended to endanger the security, integrity

and independence of the jury and might well have aroused, in the absence of evidence to the contrary, strong doubts of the purity and impartiality of their verdicts; but it was possible for the state to show and it did show definitely, with the cooperation of the defendants, what the communications with the jury were, and that these were not, in fact, of a nature to affect in any way the impartiality and purity of the verdicts.

The entrance of the doctor into the jury room seems to have appeared to the trial justice to have been an urgent necessity. There was no time, in his judgment, to wait to communicate the foreman's request to the defendants. And defendants do not claim that the trial justice should have notified them and given them a hearing before doing what he did. They recognize the necessity that prompted his action but complain that he did not notify them until after the verdict was received, and further that he was not sitting as the court when he issued his order to deputy sheriff Verria to admit the doctor into the jury room. Under the circumstances and in view of the evidence before us of what the doctor did while in the jury room, these complaints are not entitled to the serious consideration to which they would have been entitled in the absence of such evidence.

And the same may be said of the defendants' complaint against the presence in the jury room of the deputy sheriffs and especially deputy sheriff McCabe. The uncontradicted evidence of what they did while in the room is definite and explicit and there is not the slightest evidence of any conduct or conversation that could be construed as harmful to the rights of the defendants.

We do not, however, by any means condone the sending of deputy sheriffs into the jury room while the jury are deliberating. The necessity for such unusual action should be abundantly clear before it is taken or it will on occasion destroy the purity and impartiality of the jury's verdict.

The deputy sheriffs in charge of the jury have no more right than any other persons to intrude themselves into the jury room while the jury are deliberating on their verdict. Only in case of grave necessity may an exception to this rule be made and such necessity ought to be determined by the court in such a manner and with such notice to the defendant as will afford him a reasonable opportunity to protect his rights. If this is not done, and the defendant is left to learn by chance of the unusual conduct of the deputy sheriffs, even though it be by order of the trial justice, the integrity of the jury and the impartiality of their verdict may be placed under so serious a suspicion that it will be difficult and in some cases impossible to remove it. In this case, however, we are firmly convinced beyond a reasonable doubt, by the uncontradicted evidence, that such a suspicion is not justified and that there has been no deprivation of any substantial right of the defendants.

The incident of the receiving and sending of letters by several jurors is, in some respects, even more serious than the admission of the deputy sheriffs and the doctor into the jury room. It is more calculated to raise suspicions that are difficult to eradicate. The manner in which these letters were allowed to go to the jurors, the failure to acquaint the defendants with what was being done, and the chance nature of the knowledge by which they learned of it, are all conducive to a lack of confidence in the impartiality of the jury's verdicts. The fact that the deputy sheriffs, acting under the instructions of the trial justice, censored these letters could not of itself cure this infraction of the rule against outside communications with the jury.

In the first place the supervision of the letters was the duty of the court which could not properly be delegated to anyone. Originally no reading-matter of any kind was allowed to go to the jurors. But that is no longer the rule today. It is recognized by almost all authorities now that

the trial justice may, in his discretion, permit letters, newspapers and other written communications to be received by the jurors, provided that they contain no matter pertaining to the case on trial. But this is a judicial discretion which may be reviewed for abuse. Accordingly the court should itself examine the communications and call them to the attention of the defendant in a criminal case, so that he may be thus afforded an opportunity to record his objection, if he believes there is any matter contained in the communications prejudicial to him.

In the instant case the trial justice deprived the defendants of this right by delegating his authority, without defendants' consent or even their knowledge, to the officers in charge of the jury. By reason of such erroneous action not only were these defendants denied supervision of these letters by the court, but they were likewise denied an opportunity to know that the jurors were thus receiving such communications from the outside; and defendants were also denied knowledge of the contents of those communications. Since the trial, as a result of the cooperation of the state and the defendants, definite knowledge of the contents of the letters has been obtained by affidavits of the jurors; and by the affidavits of Verria and McCabe, which corroborated the affidavits of the jurors substantially in every important respect.

This evidence convinces us that the defendants were not harmed in any way by the reception of these letters by the several jurors. Our opinion rests, not upon the statement contained in each of the affidavits of the jurors that there was nothing in the letters pertaining to the case on trial, either directly or indirectly, or in the statements, substantially to the same effect, in the officers' affidavits, but on the definite statements in the affidavits as to what the letters did contain from which we ourselves deduce a lack of prejudice to the defendants.

It has been well said that the testimony of jurors as to their misconduct or irregularity in the receipt of sealed letters ought to be received with caution. *State of W. Virginia* v. *Robinson*, 20 W. Va. 713. In that case the court considered at great length the reason and authority which support the rule forbidding communication with the jury, especially in a criminal case, and at page 760 of its opinion it said: "The reason, why a jury is required to be kept together, deprived of social intercourse, not even allowed to visit their families without the attendance of an officer, is, because it is regarded to be absolutely necessary to the due administration of justice; that in a criminal trial where a man's life or his liberty is committed to the keeping of a jury of his peers, it is his right, that they shall be kept absolutely free from all outside influence, which might prejudice his case with the jury and do him injury."

In that case the jurors had received letters under seal without inspection by anyone and, though they later testified that the contents of the letters in no way related to the trial, the court nevertheless held their verdict was vitiated by such unlawful communications, saying at page 761: "In a case like this, where the letters are not produced, and it is not except from the testimony of the jurors shown, how many were received, the testimony of members of the jury, that the letters received did not relate to the case on trial, is not sufficient to rebut the presumption from the receipt of sealed letters during the trial, that the prisoner was injured thereby. A sound public policy requires this rule."

We are in accord with the reasoning of the court in that case. Were the instant case one where the jurors had received uninspected, sealed letters, as to which they testified only their conclusions that what was contained in the letters did not relate to the trial, we would be more inclined to decide, as did that court, that a sound public policy required a reversal of this jury's verdicts. But in the case before us

thè letters were inspected and censored, were unsealed, and their contents were specifically testified to by the jurors. Since the jurors' testimony, by way of their affidavits, was corroborated by the officers who had previously inspected and censored the letters, we are satisfied that the danger to a sound public policy which the West Virginia court apprehended in the case before it does not exist here.

However, we agree with that court in saying: "All the letters received by the jury ought first to be inspected by the court trying the case. The court is both the guardian of the life and liberty of the citizen, as well as the dearest interests of society; and no letters ought to be permitted to be received by the jury or by any member thereof, who are trying a felony case, without being first inspected by the court, so that the court could know that no influence calculated to injure the prisoner or the state was in that way brought to bear upon the jury."

We thus conclude that the defendants here have not been prejudiced by any of the irregularities or unlawful communications with the jury of which they have complained. However, in support of their contention that they should be given a new trial, they claim that the law in this state is to the effect that, regardless of the motive for or the prejudicial effect of unlawful communications with the jury, such as here complained of, there must be a reversal of the jury's verdicts, and they cite *State* v. *Nelson*, 19 R. I. 467. They also cite numerous cases of a like nature from other jurisdictions. Nothing that we have said herein nor our decision to deny this petition is to be taken in any way as a disapproval of the principle of law laid down and applied to the facts in the *Nelson* case, *supra*. On the contrary, we recognize its wisdom and soundness. But the facts of that case were not the facts of the instant case, and we think that it was the factual situation in the *Nelson* case that weighed with the court as much as anything in leading it to its decision.

There the trial justice, upon being informed by an officer of the court that one of the jurors was sick at his home and would not be able to come to court and resume his duties as a juror for some time, dismissed the jury from further consideration of the case. This was done by the trial justice over the defendant's objection and without making any inquiry of a judicial nature to ascertain the real condition of the allegedly sick juror. By this action, the trial justice put it irrevocably beyond his power or that of this court to assure to the defendant the right, which was his, to have his case tried by the jury before whom he had been placed in jeopardy, unless a judicial inquiry disclosed that such a course would be impossible. No judicial inquiry having been made, this court held that the action of the trial justice was wholly unlawful and therefore it was not a sufficient answer to the defendant's plea of former jeopardy upon a second trial before another jury for the same offense.

In the instant case, on the contrary, the action of the trial justice, though irregular, did not result in denying these defendants any remedy for the things of which they complain. By accepting the physician's report that the sick juror was able to continue his duties as a juror, and by permitting the jury to continue deliberating until they reached their verdicts, the trial justice has in fact afforded the defendants an opportunity to make whatever attack they deemed pertinent upon the conduct of the trial justice. Had he done what the trial justice did in the *Nelson* case and discharged the jury upon the report which he received from the deputy sheriff, or had he arbitrarily discharged them upon receiving Dr. Bishop's report of his examination and treatment of the sick juror, these defendants would then have had good cause to complain if tried again before another jury on the same charge. This case then would have been on practically all fours with the *Nelson* case.

On the whole, after thoroughly considering the reasoning of the cases similar to the *Nelson* case which the defendants

have cited in their brief, we are satisfied that the instant case does not fall in the same category. The defendants in the instant case are, by this special proceeding before us for a new trial, receiving the benefit of a judicial inquiry into the things which this court, in the *Nelson* case, said the defendant was irrevocably deprived of by the arbitrary action of the trial justice.

We are not unmindful of the importance to the jurisprudence of this state of the question which these defendants have raised. And especially do we appreciate its importance in a criminal case of a serious nature such as the instant case. Consequently, we have not minimized it but rather have given it the utmost consideration consistent with our conception of its gravity. We have patiently and diligently investigated and weighed the numerous cases cited in the briefs of counsel and have sought to determine, in the light of these cases, the validity of the defendants' contentions. And it may not be amiss to add that, throughout our labors, we have kept steadily in mind that jealous regard which is so significantly and strikingly expressed in our constitution and the common law for the ancient institution of trial by jury. Likewise we have kept constantly in view that other great and salutary principle which has been said to be "the crown and glory of the common law"—that the accused shall be presumed to be innocent until he is proven guilty beyond a reasonable doubt.

To give strength and efficacy to that principle in practice, the imperative importance and necessity of safeguarding and protecting the jury from the danger of outside contamination has been recognized from the earliest period of the common law of which we have any record. One court has well and succinctly given voice to the reason underlying and motivating this philosophy of the law in the following words: "That confidence in trial by jury may be preserved, and that parties may feel a verdict is based on an honest

consideration of the evidence, and not on prejudice or sympathy, every appearance of evil must be avoided, and every precaution taken to guard against all matters tending in the slightest degree to corrupt or influence the verdict." *Schankweiler* v. *Pennsylvania Light Co.,* 275 Pa. 50, 53, 118 A. 562.

And earlier the same court expressed it thus: "It has been said that the greatest object of civil government is to get twelve honest men in the jury box. If this is true, after they get there they must be kept there, hedged around not only with their own integrity, but with every precaution against evil communication which may corrupt them; and when they go to their room to deliberate upon an issue in which is involved the life, liberty or property of their fellow man, their conduct in the discharge of such solemn duty must comport with it, else confidence in the system which is the best achievement of civilization will be lost." *Mix* v. *North American Co.,* 209 Pa. 636, 645, 59 A. 272, 274.

However, whether or not any irregular or unlawful communication with the jury shall be held to have vitiated the jury's verdict is to be determined by the application of principles ably expounded and applied in *Commonwealth* v. *Roby,* 12 Pick. (Mass.) 496, and *State* v. *Cucuel,* 31 N. J. L. 249. In the former case *Shaw, C. J.* said: "The impartiality, purity and strict regularity of jury trials, especially in capital cases, are of the highest importance to the peace, welfare, harmony and security of the community. Whilst a jury trial ought to be so conducted, that a verdict may command entire confidence in all these respects, it is on the other hand so far deserving of deference, that it ought not to be lightly set aside, on grounds that do not affect it in these essential particulars." And further on, at page 516, he added: "But it is not every irregularity which will render the verdict void and warrant setting it aside. This depends upon another and additional consideration, namely, whether the irregularity is of such a nature as to affect the impartiality, purity and regularity of the verdict itself."

In *State* v. *Cucuel, supra,* the New Jersey court, after re-viewing at some length the early English case of *The King* v. *Stone,* 6 T. R. 527, deduced the true rule to be that the jury should be kept apart for the purpose of preventing them or any of them from having intercourse with any persons *on the subject of the trial.* And at page 257 it said: ''It is not the legal right of the prisoner that the court should go further than this.'' Previously, in its opinion, at page 255, it said: "All that the law attempted, all that it could ration-ally attempt was to prevent the intrusion into the mind of the jury of the sentiments of the community or of some of its members, touching the matter under judicial cognizance."

These principles, so logically deduced and clearly and simply stated by the distinguished jurists of Massachusetts and New Jersey who wrote the opinions in those cases, would seem to have been in the mind of this court in certain cases somewhat akin to the instant case. In all of them the court recognizes that the irregular or unlawful communica-tion with the jury may vitiate the verdict if it does not ap-pear that such communication or irregularity is harmless, but in no case does the court recognize the irregularity itself, without more, as fatal to the verdict. For example, in *Car-penter* v. *Carpenter,* 48 R. I. 56, where there had been a communication, pertaining to the matter on trial, in the hearing of a juror, the court considered and weighed the substance of the communication before deciding that the jury's verdict was void.

In *Macchia* v. *Ducharme,* 44 R. I. 418, the court granted a new trial because the trial justice communicated an in-struction to the jury in the absence of counsel of the un-successful party in violation of Rule 17 of the superior court, but the court intimated that, had a record of what the trial justice said to the jury been preserved, it might have been found that the error was not prejudicial.

And in *State* v. *O'Brien,* 7 R. I..336, 340, where one mem-ber of the jury was allowed to go alone into a room in his

home to change his clothes, the officer who accompanied him remaining at the door, the officer testified that the juror could not have conversed with anyone improperly. In holding that the verdict should not be set aside for this cause, the court said: "It is well settled that the separation of the jury, where no injury has ensued to the party objecting, will not be ground for setting aside a verdict, unless the separation be attended with suspicion of abuse, or of some improper influence."

So in *Darling* v. *N. Y., Providence & Boston R. R. Co.*, 17 R. I. 708, on the following facts, the court considered the nature of the communication complained of and found no cause for a new trial. In that case, while the jury were deliberating, the sheriff, at the direction of the court, asked the jury if there was any prospect of an early adjournment. The foreman said he would knock on the door at 5:45 p. m., and let him know, whereupon the sheriff replied: "If you do not, you can take your own time," adding jokingly, "all night if necessary." The defendant contended that this was a threat, to keep the jury over night, unless they agreed at 5:45 p. m. Defendant argued that such communication was conclusively presumed prejudicial.

In rejecting this latter contention, the court, while admitting there was authority to support it, said at page 710: "But the weight of authority and the better opinion, as it seems to us, is to the effect that, unless the communication from the officer to the jury had a manifest tendency to influence the jury improperly against the unsuccessful party, or was such that prejudice has resulted to such party, it furnishes no ground for a new trial."

In *State* v. *Mowry*, 21 R. I. 376, where an officer took the jury outside the limits of the county, the defendant contended that this constituted a separation of the jury, as the officer had no authority outside the county and the jury were no longer in custody. The court held that even if this

were so it would not justify a new trial as the evidence showed no improper influence. "It has many times been held", said the court, "that the mere separation of the jury, though against the express directions of the court and in violation of their duty, will not of itself be a sufficient cause for setting aside the verdict." The court then concluded, in the circumstances before it, that the alleged separation did not warrant a new trial.

We think nothing more need be said or further authority cited and discussed. Both reason and precedent appear to us to be against the defendants' contention that the irregularities in the instant case in and of themselves vitiated the jury's verdicts. We are, therefore, of the opinion, after inquiring into the nature of such irregularities and their probable effect on the jury's verdicts, that they did not deprive the petitioners of a full, fair and impartial trial.

The petitioners rely on one other ground for their petition which we have reserved for separate and final treatment. They contend that because the trial justice granted the state's motion for sentence *ex parte* without notice to them and without evidence of any kind, it is such gross error as demands a new trial. They also add a further reason that it was a violation of G. L. 1938, chap. 496, § 3, which prescribes a vacation for the superior court, because at the time the trial justice granted the state's motion, he was not legally sitting as the superior court, there being another justice of that court regularly assigned and sitting at that time as such court in accordance with the statute.

We shall not pass upon these contentions in this proceeding, since we do not consider them to bear upon the question whether defendants have had a full, fair and impartial trial within the meaning of G. L. 1938, chap. 535, § 5. If worthy of consideration at any time, it would more properly be at such time as the defendants shall have exhausted all their remedies in the regular course of review of errors alleged to have

been committed at their trial and after the validity of the verdicts has been finally upheld. The defendants have a bill of exceptions pending in this court and have been released upon bail. Obviously, unless and until those exceptions are finally decided adversely to them, there is no need of deciding whether these sentences were regularly or irregularly pronounced.

For the reasons stated herein, the defendants' petition for a new trial is denied and dismissed.

*Louis V. Jackvony,* Attorney General, *James O. Watts,* Third Asst. Atty. Gen., *Amos L. Lachapelle,* Spec. Asst. Atty. Gen., for State.

*Aram A. Arabian, John H. Nolan,* for petitioners.