341 A.2d 744.

STATE *vs.* ROBERT O. LEWIS.

JULY 28, 1975.

PRESENT: Roberts, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

JOSLIN, J. On March 10, 1971, Robert O. Lewis was found guilty before a judge and jury in the Superior Court on two indictments charging him with murder. Following the denial of motions for a new trial, concurrent sentences of life imprisonment were imposed, and he was

committed to the Adult Correctional Institutions. Pending hearing in this court on his bill of exceptions the defendant escaped from custody, whereupon the state moved that his bill of exceptions be dismissed on the ground that he was a fugitive from justice. That motion was denied but without prejudice to the state's right to renew, either when the defendant was again in custody or on or after June 1, 1973, whichever should first occur. *State* v. *Lewis,* 110 R. I. 948, 296 A.2d 120 (1972). On June 12, 1973, the state renewed its motion, and although the defendant was still at-large the motion was denied. *State* v. *Lewis,* 112 R. I. 902, 307 A.2d 544 (1973). The defendant was later apprehended and was in the state's custody when the case was heard by us on his exceptions to the denial of his pretrial motion to suppress, and of his later motions to instruct the jury as requested and for a new trial. At that hearing the state again renewed its request that we exercise our inherent power to enforce respect for the judicial process by refusing the defendant appellate review, on the ground that his illegal escape constituted a willful flouting of that process and a voluntary abandonment of his right to obtain review. The view we take of the case, however, makes it unnecessary for us to pass on the state's request.

### The Motion To Suppress

On the morning of August 2, 1969, one Clifford Hancock discovered two charred, dead bodies in the woods adjacent to Lake Road in the town of Tiverton. He called the police, who identified the dead bodies, and subsequent autopsies disclosed that the victims had been shot before being set afire.

Hancock had gone into the woods that morning because while driving along Lake Road early the previous evening he had noticed a fire burning in the nearby woods and had also seen a man, later identified as defendant, run out of the lane leading from the woods and get into the pas-

senger seat of a station wagon backing out of the lane. The station wagon was proceeding in the same direction Hancock was headed, and as he followed it he could see the left profile of the passenger. He also noted that the wagon had New Jersey license plates and a loud exhaust.

During the ensuing police investigation, a list of names and addresses, including defendant's, was found on the body of one of the murdered men. The police then attempted to locate defendant for questioning, and on the afternoon of August 3, two officers cruising in a section of town to which he had reportedly moved saw a station wagon that generally fit Hancock's description of the one he had seen leaving the scene of the crime, except that it had Rhode Island plates fastened with what appeared to be new nuts and bolts. It was parked in a driveway, and the names on the mailbox in front of the adjoining cottage were "Lewis" and "Richard."

The police then approached the residence, knocked on the door, and a Mrs. Carol Richard answered. She told them that defendant was living with her, that they both knew the victim on whose body defendant's name had been found, and that defendant was expected home later that day. She also informed them that the station wagon was hers, a fact confirmed by a later examination of the registration, and that it had not been out of the yard on the evening of August 1.

Earlier in their investigation the police had discovered paint scrapings on some embedded rocks at the murder scene, and in order to ascertain whether they had come from the parked station wagon the officers asked Mrs. Richard if they could examine the wagon. She gave her permission, and the police then inspected its underside and observed dents and scratches on the splashpan and a cross member. Because Mrs. Richard told them that defendant would be returning at about 5:30 p.m., they left

and returned at that hour. When they learned that he had not yet come home, they departed and stationed themselves a block or two down the street. About an hour later Mrs. Richard, accompanied by her sister and several children, left the house, entered the station wagon, and drove toward the officers. As she passed them, they heard a loud exhaust noise similar to that attributed by Hancock to the station wagon he had seen on Lake Road. The officers thereupon apprehended Mrs. Richard and took her and the station wagon to the Portsmouth State Police barracks. During the interrogation that followed she signed a written consent form authorizing the police to search the station wagon.[1] The police then took the wagon to a lift, elevated it, photographed its underside, and took paint scrapings for comparison with those previously taken from the rocks at the murder scene. Later that evening Mrs. Richard signed another consent form authorizing the police to search her home for firearms, nonresident registration plates, and articles of clothing deemed to be of value to the investigation.

During and following the Richard investigation the search for defendant continued, and on Monday, August 4, the eyewitness Hancock was shown more than 100 "mug shots" from the state police files in the Portsmouth barracks. He was unable to identify any of the photographs as being of the man he saw run from the woods and get

---

[1]The consent form, in pertinent portion, reads as follows:

"The undersigned, Carol A. Richard * * * hereby authorized the representatives and law enforcement officers of the Rhode Island State Police to search the 1964 Ford Station Wagon 4 door, color white, bearing Rhode Island Registration PK-319 owned by or in possession of the undersigned. The law enforcement officers herein above mentioned have advised me that I do not have to execute such waiver and consent and have further advised me of my rights in connection therewith, but I do hereby waive any and all objections that may be made by me to said search and declare that this waiver is freely and voluntarily given of my own will and accord."

into the station wagon. He did, however, select pictures of two men he thought had similar characteristics. That evening he was shown the station wagon which the police had seized the previous day, and after he had heard its exhaust noise he positively identified it as the vehicle he had seen at the murder site.

Two days later a Fall River attorney who had represented defendant on a prior occasion, and had seen him only a few days before, received a telephone call from a Sergeant Donley of the Fall River Police Department asking him to bring defendant to his office on the second floor of the Fall River police station at 10 a.m. the following morning, August 7. Although the attorney was not told why the police were interested in defendant, he agreed to comply with the request. The police then notified Hancock that they would pick him up about 9 a.m. on August 7, to take him to the station. They did so, and enroute to the station one of the two accompanying detectives told him they "were going to the Fall River [D]epartment and an attorney was going to surrender a suspect in this case * * * and there was a possibility he might submit him to a lineup."

When they arrived at the station shortly before 10 a.m., Hancock and one of the detectives sat on a bench in the hallway of the second floor while the other detective went to search for Sergeant Donley. Soon thereafter Hancock saw defendant, his attorney, and Mrs. Richard approaching him as they walked toward Sergeant Donley's office. He recognized defendant as the man he had seen run from the woods onto Lake Road and get into the station wagon, and he so advised the detective seated next to him. The defendant was then arrested on a fugitive warrant for murder. Later that day, Hancock was shown a photograph of defendant and made a formal statement concerning the identification. Eight days later, on August 15, the

police prepared and showed Hancock a rendition warrant, which was accompanied by the same photograph of defendant that Hancock had seen on August 7 after his initial "hallway" identification.

Subsequent identifications of defendant were made by Hancock on the following occasions: on November 7, 1969, at a bail hearing held in the Superior Court in Newport (there were 15 spectators in the courtroom at the time, and defendant was seated in the last row of the spectators' section between two police officers. One policeman was in uniform, and the other was in civilian clothing and was known personally by Hancock); at a probable cause hearing held on December 19, 1969; in December 1970, when a hearing on defendant's motion to suppress was conducted; and finally at the trial in March 1971.

The defendant moved to suppress both the Hancock identification testimony and the evidence relating to the station wagon. First he contends that, independent of any right to counsel claim, *Stovall* v. *Denno,* 388 U. S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), and *Simmons* v. *United States,* 390 U. S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), require the suppression of the Hancock identification because it stemmed from an initial confrontation, in the hallway of the Fall River police station, that was so unnecessarily and impermissibly suggestive as to give rise to a very substantial likelihood of subsequent irreparable misidentification. And he says that here the high probability of misidentification, admittedly the primary evil that *Stovall* was intended to avoid, becomes evident upon the application of the criteria set forth in *Neil* v. *Biggers,* 409 U. S. 188, 199-200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411 (1972). The defendant admits, however, that the *Stovall-Simmons* standard is two-pronged and that the ultimate jury question of the likelihood of misidentification is not reached at the suppression hearing stage unless it is first

demonstrated that the initial confrontation was suggestive. *United States* v. *Sutherland,* 428 F.2d 1152, 1155 (5th Cir. 1970). On that issue the substance of defendant's argument is that Hancock, who was taken to the police station to view a suspect, had been "psychologically programmed" by extraneous suggestive forces leading up to the hallway confrontation to make a "familiar association response" and identify that suspect, whoever he was, as the man he saw running from the scene of the crimes.

■ ▪ But, unlike defendant, we see no real indication in this record that Hancock expected to encounter a suspect prior to viewing a customary lineup, or that his identification of defendant as he walked along a public second floor hallway was anything other than an uninvited, spontaneous reaction. And without finding such support in the record we are unable to conclude either that the one-on-one show-up, *per se,* violates due process, *see Neil* v. *Biggers, supra* at 198, 93 S.Ct. at 382, 34 L.Ed.2d at 411, or that for other reasons the trial justice erred when he concluded that "this was an accidental confrontation where witness Hancock spontaneously identified defendant upon sight."

■ ▪ The defendant contends second that the evidence relating to the station wagon was the product of illegal warrantless searches and should therefore have been suppressed. We cannot agree. The defendant was not using the wagon at the time of the contested searches and seizures, alleges no direct proprietary or possessory interest therein, and cannot rationally claim that possession of the wagon is an essential part of a homicide charge. He thus fails to satisfy the standing requirements established in *Brown* v. *United States,* 411 U. S. 223, 229, 93 S.Ct. 1565,

1569, 36 L.Ed.2d 208, 214 (1973),[2] and cannot be heard to complain of the searches and seizures in question. *See State v. Robertson,* 102 R. I. 623, 626, 232 A.2d 781, 784 (1967), *cert. denied,* 390 U. S. 1036, 88 S.Ct. 1436, 20 L.Ed.2d 296 (1968).[3]

## The Trial Justice's Instructions To The Jury

At the close of the trial, defendant requested that one of five instructions be given to the jury, each of which said in one way or another that the hazards of identification testimony are so serious that such testimony ought to be weighed with great caution.[4] The trial justice, however, denied defendant's specific requests. Instead, in his own words and quoting at length from various cases including *Commonwealth v. Kloiber,* 378 Pa. 412, 424, 106 A.2d 820, 826-27 (1954), he addressed that issue by telling the jury, in effect, that they should view identification testimony with caution if the witness' opportunity for positive identification was not good, if his testimony was

---

[2]The *Brown* Court declared that there was no standing to contest a search and seizure where the defendants:

"(a) were not on the premises at the time of the contested search and seizure; (b) alleged no proprietory or possessory interest in the premises; and (c) were not charged with an offense that includes, as an essential element of the offense charged, possession of the seized evidence at the time of the contested search and seizure." *Brown v. United States,* 411 U. S. 223, 229, 93 S.Ct. 1565, 1569, 36 L.Ed.2d 208, 214 (1973).

[3]Disposition of defendant's motion to suppress the station wagon evidence on this basis, of course, makes unnecessary any consideration either of the effectiveness of Mrs. Richard's consent to those searches and seizures or of the constitutionality of the contested conduct itself.

[4]Typical of the requested instructions is the following:

"You must weigh the eyewitness identification testimony you have heard with very great care, because 'The hazards of [identification] testimony are established by a formidable number of instances in the records of English and American Trials.' Frankfurter, *The Case of Sacco and Vanzetti,* 30 (1927)."

qualified, if his positive statements were weakened by cross-examination or by his failure to identify defendant on one or more prior occasions, or if the accuracy of his testimony was doubtful. And he went on to say that in any event proof beyond a reasonable doubt of an accused's identity as the person who committed the crime was essential to a conviction.

We share with defendant a concern for the potential hazards inhering in the use of eyewitness identification testimony. It seems to us nonetheless that the instructions here given adequately protected against those dangers by stressing with particularity that caution was in order whenever the jury perceived weaknesses of any kind in the identification evidence, and that in all events the jury were to be satisfied beyond a reasonable doubt that the person identified was in fact the person responsible for the offense charged.

### The Defendant's Motion For A New Trial

After his conviction on March 10, 1971, defendant moved for a new trial on the ground, among others, that the verdicts were against the weight of the evidence. The defendant recognizes that it is the trial justice's function on a motion for a new trial to pass upon the weight of the evidence and the credibility of the witnesses. Consequently, he does not now challenge the trial justice's use of credibility as his touchstone for rejecting the evidence presented by the defense and for accepting Hancock's testimony. Instead, he contends only "that there *has* to be a reasonable doubt as to whether Hancock was correct in identifying the defendant as 'the running man' he saw on August 1st," and he supports that contention by enumerating and amplifying what he asserts are fatal weaknesses undermining the probative force of Hancock's testimony: Hancock's limited educational background, and questionable character, his inadequate opportunity to ob-

serve the man he saw run from the woods on August 1, various significant inconsistencies in the details of his testimony, the lack of correlation between his original description of the man he saw and defendant, and, finally, the suggestiveness of the original Fall River confrontation, which in defendant's view more probably led to a programmed "familiar association response" and misidentification of defendant than to reliable evidence supporting the verdicts.

In his decision on defendant's motion, the trial justice commented at length on much of the same evidence which defendant argues points irresistibly to fatal weaknesses in the state's case. Unlike defendant, however, the trial justice drew from that evidence inferences that in his opinion bolstered the probative weight and sufficiency, as well as the relative credibility, of Hancock's testimony, and nothing in defendant's argument suggests to us that the trial justice overlooked or misconceived material evidence on this admittedly controlling issue or was otherwise clearly wrong in his finding that the state had more than met its burden. That being so, we find he was not in error to deny this part of defendant's motion. *State* v. *Clark,* 114 R. I. 82, 328 A.2d 727 (1974); *State* v. *Lima,* 113 R. I. 6, 316 A.2d 501 (1974); *State* v. *Nault,* 112 R. I. 687, 695, 314 A.2d 627, 631 (1974).

The motion for a new trial was also based on alleged jury misconduct. The defendant complained specifically that 8 of the 12 jurors had made unmonitored telephone calls during their deliberation period and that any one of those conversations might have improperly affected the final verdicts. Although the trial justice opined that the law of this state did not permit inquiry of the jurors, he nonetheless recognized the necessity of providing a record on appeal. Accordingly, he took sworn testimony from each of the jurors, and he concluded therefrom that de-

fendant had "in no way, shape or fashion" been prejudiced by the unmonitored telephone calls.

The defendant does not challenge the principle that irregular communications with the jury do not in and of themselves vitiate a jury's verdict but do so only if a defendant has been prejudiced thereby. *State v. Verde,* 66 R. I. 33, 41, 17 A.2d 39, 43 (1940). He asserts, however, that a mere showing that unlawful communications occurred gives rise to a presumption of prejudice, which he further contends could not on the facts of this case be adequately rebutted by juror testimony alone. *See Remmer v. United States,* 347 U. S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654, 656 (1954); *State v. Verde, supra* at 41, 17 A.2d at 43; *State v. Robinson,* 20 W.Va. 714, 755-56 (1882).

At the outset, the state contends and defendant concedes that a long line of this court's prior decisions[5] enunciate a general rule that evidence from jurors of their own misconduct will not be received to impeach a verdict. But defendant argues that this court has abandoned an across-the-board application of the no-impeachment rule, and he contends that the circumstances of this case are governed not by the general rule but by the exception set forth in *Carpenter v. Carpenter,* 48 R. I. 56, 58-59, 135 A. 325, 326 (1926).[6] In that case this court concluded that jurors' affidavits were admissible to establish irregular communications from outsiders — as opposed

---

[5]Those cases start with *Tucker v. Town Council,* 5 R. I. 558 (1859) and conclude with *Palumbo v. Garrott,* 95 R. I. 496, 188 A.2d 371 (1963), *Bradshaw v. Campbell,* 103 R. I. 319, 237 A.2d 547 (1968), and *State v. Palmigiano,* 115 R. I. 166, 341 A.2d 742 (1975).

[6]In *Carpenter v. Carpenter,* 48 R. I. 56, 135 A. 325 (1926), jurors in a will contest were permitted to testify that the executor under the will on the last day of the trial told them of prior settlement offers. Based upon that testimony, a new trial was granted.

to misconduct attributed to the jurors themselves — and that such evidence was sufficient to warrant a new trial where the trial justice was satisfied that the misconduct might have had a disturbing influence upon the jurors' deliberations and verdict. The defendant contends that the critical facts here are similarly, at least in part, the existence and contents of telephone communications from others, and that juror testimony proving those facts is therefore admissible under the *Carpenter* ruling.

The distinction defendant draws between the *Carpenter* exception and the general rule of nonimpeachability is compelling, and we agree with him that in this case juror testimony was admissible for the purpose of establishing the existence of unpermitted and possibly prejudicial conversations with outsiders. Moreover, we assume, without deciding, that those communications gave rise to a presumption of prejudice. *See State* v. *Verde, supra* at 41, 17 A.2d at 43 (1940).[7] When we proceed on that assumption, the only issue remaining is whether the evidence upon which the trial justice relied in denying defendant's motion was sufficient to rebut such a presumption.

In *Verde,* this court expressed its agreement with the reasoning of *State* v. *Robinson, supra* at 761, where the West Virginia court held that jurors' testimony, to the effect that uncensored sealed letters received by them were unrelated to the case on trial, was insufficient to

---

[7] In *State* v. *Verde,* 66 R. I. 33, 17 A.2d 39 (1940), jurors' affidavits and other evidence revealed the presence of a doctor in the jury room during deliberations to attend a sick juror, and also disclosed that court-censored letters had been delivered to the jurors during the trial. We held that the nature of the irregularities were not such as to have deprived the petitioners of a full, fair, and impartial trial, and we left open the question of whether the party seeking a new trial is burdened with showing that he had been prejudiced by the unlawful communication or whether the mere proof that unlawful communications occurred gave rise to a presumption of prejudice.

230

rebut a presumption of prejudice. But in that case the letters were not produced, and instead the jurors testified only to their individual conclusions that the irregular communications received by them were unrelated to the case upon which they were deliberating. Here, in contrast, the trial justice examined each juror about the content of his telephone call, and the jurors testified with specificity to what was said in their conversations. This painstaking process pursued by the trial justice revealed that the jurors, after suspending their deliberations for supper, were permitted by the sheriff to make a series of calls from an office adjacent to the jury room to members of their families. It further disclosed that the conversations were, without exception, very short and confined to statements by the jurors like "Go ahead and have dinner, I don't know when I'll be home," and "Tell my brother Henry to pick up the car if I am not home in an hour," and to equally brief and innocuous responses by the parties called, such as "Right, goodbye," and "Okay, I'll see you later."

The gravity of defendant's challenge to the fairness of his trial is obvious, and we, like the trial justice before us, do not entertain this issue lightly. We have carefully considered, however, the setting in which the calls were made, their evident purpose, the extensiveness of the trial justice's inquiry, and the jurors' direct testimony on the actual content of the conversations rather than their conclusory statements as to the nature and effect of the calls. We conclude therefrom, despite defendant's urging to the contrary, that the trial justice's finding of no prejudice in these circumstances was supported by evidence sufficient to rebut any presumption of prejudice that might have arisen from the mere showing of the unlawful communications.

The defendant asserts as the final ground for his motion

for a new trial that subsequent to the verdicts he discovered new evidence which, despite due diligence on his part, was not obtainable prior to trial, and which, had it then been available, would have been material to the critical events of the evening of August 1, 1969 and would undoubtedly have changed the result of the case. Instead of following the usual practice of deciding the motion on the basis of supporting affidavits and any counter affidavits filed by the state, the trial justice, over the state's objection, took testimony *de bene esse*. The sum and substance of that evidence consists of the testimony of three witnesses who attributed to Mrs. Hancock certain pretrial statements to the effect that her husband had not driven on Lake Road on the evening of August 1, 1969, had seen nothing pertaining to the offenses charged, and was being paid by the state police for incriminating defendant. One of those witnesses had also testified at the trial, but had not related to the jury what he told the trial justice at the new trial hearing. His explanation was that he simply had not remembered it. In addition, Mrs. Hancock also appeared, denied making the statements attributed to her, and also denied speaking with her husband about the murders and knowing anything about the case other than what she had read in the newspapers.

After hearing the proffered evidence, the trial justice concluded that it was inadmissible hearsay, that it did not truly qualify as newly discovered evidence, and that it was incredible. And on those bases he denied the motion. Irrespective of the validity of the first two of those reasons, it seems to us that his third reflects the settled law of this state which authorizes a trial justice to determine the credibility of newly discovered evidence upon which a request for a new trial is based, and allows him to deny the motion when satisfied that such evidence is

probably untrue and unworthy of belief by the jury. *See State* v. *Carsetti,* 111 R. I. 642, 652, 306 A.2d 166, 171-72 (1973); *Joslin* v. *Rhodes,* 45 R. I. 371, 375, 122 A. 779, 780 (1923).

The defendant argues, however, that "Material new evidence * * * impeaching directly the heart of the State's case, is for a jury to assess," and that a departure from that principle in this case would permit the trial justice to "appoint himself a super jury of one." Judge Oliphant's eloquent response to a like contention is:

> "In determining whether or not the alleged newly discovered evidence would probably change the result reached at the trial of these defendants the credibility of that evidence must be evaluated, and this question must be resolved by the trial judge in the first instance and not by a jury as asserted by the appellants. To hold otherwise would make a mockery of justice and for the easy unsettlement of judgments, for new evidence even though obviously testimonially untrustworthy, would mean a new trial in every instance to have the credibility of the witnesses submitted to a jury. We concur in what was said by Judge Cardozo in his concurring opinion in *People* v. *Shilitano, supra,* concerning the function of the trial judge upon an application for a new trial upon the ground of newly discovered evidence: '* * * I do not mean that to justify a new trial, he must have been convinced — firmly or with a sense of certainty convinced — that the first story of the witnesses was false and that their new story was true. He might act upon a reasonable probability. But if, on the contrary, he was *convinced* that the second tale was false, that a criminal league had been formed to set at naught the verdict of the jury and the judgment of the court, his duty was clearly marked. * * * *He was not at liberty to shift upon the shoulders of another jury his own responsibility. That would have been to make the conspiracy triumph.* He was charged with a responsibility to seek the truth himself." [218 N. Y. 161, 112 N.E. 739]. *State* v. *Bunk,* 4 N. J. 482, 488, 73 A.2d 245, 248 (1950).

For the foregoing reasons we conclude that the allegedly newly discovered evidence relied upon by defendant does not entitle him to a new trial.

The defendant's exceptions are overruled, and the case is remitted to the Superior Court for further proceedings.

*Julius C. Michaelson,* Attorney General, *John Austin Murphy,* Special Asst. Attorney General, for plaintiff.

*William F. Reilly,* Public Defender, *Daniel F. Featherston, Jr., Featherston, Homans & Klubock,* Boston, Massachusetts, for defendant.