656 A.2d 954 (1995)
STATE
v.
Richard HARLEY.
No. 92-192-C.A.
Supreme Court of Rhode Island.
April 7, 1995.
*955 Jeffrey Pine, Atty. Gen., Lauren S. Zurier, Asst. Atty. Gen., Aaron Weisman, Asst. Atty. Gen., for plaintiff.
David Cicilline, Providence, for defendant.

OPINION
WEISBERGER, Chief Justice.
This case comes before us on the appeal of the defendant, Richard Hartley, from a judgment of conviction entered in the Superior Court on one count of robbery in violation of G.L. 1956 (1981 Reenactment) § 11-39-1. Hartley was sentenced to fifteen years imprisonment with eight years to serve and the balance of the sentence suspended. We remand the case to the Superior Court for an evidentiary hearing. The facts of the case insofar as pertinent to this appeal are as follows.
On November 22, 1988 at six o'clock in the evening, Joyce Daigneault (Daigneault) was closing up The Bargain Shed, a retail store in Johnston that she owned with her husband. *956 As she left the store to go to her car, which was parked on the side of the store, two men approached her. Daigneault was carrying a canvas bag containing gold jewelry that she was taking home with her from the store for the night, as was her usual practice. One of the men came up to her and sprayed something, which was later determined to be mace, in Daigneault's face. Daigneault turned her head and the mace hit her on the left side of her face, including her left eye and on the back of her head. The mace did not affect her right eye. As he was spraying the mace in Daigneault's face, her assailant pushed her to the ground and attempted to take the canvas bag containing the gold jewelry. A struggle ensued and the canvas bag split in half. When the bag split, the plastic bag containing the jewelry (the jewelry was in a plastic bag that in turn had been placed into the canvas bag) fell out and the assailant took it and handed it to the second man. The two men then fled.
Daigneault gave a written statement to the Johnston police the night of the robbery in which she described her assailant and his confederate. Three days later she assisted in the preparation of a composite drawing of the assailant by putting together pictures of various facial characteristics from a kit at the Johnston police station.
About a week after the robbery Daigneault positively identified from police photographs the second of the two men who had participated in the robbery. This was the man who stood by and was handed the bag of jewelry by his accomplice. This man's name was Anthony Meo (Meo), alias Anthony Rhody.
About six months after the robbery, Daigneault was at home and saw a photograph on television of the man who had sprayed her with mace and pushed her to the ground. She then called her husband and told him that she had seen the man who had robbed her on television. Her husband called the Cranston police and learned that the name of the man whose picture Daigneault had seen on television was Richard Hartley, the defendant in this case.
Within a week of seeing this picture on television Daigneault was shown an array of photographs by Detective Steppo from the Johnston police department. Detective Steppo was unaware that Daigneault had recently seen defendant's picture on television. Daigneault picked out one of the photographs shown her by the detective as being that of the man who had sprayed her with mace and struggled with her the night of the robbery. This was the same man whose picture Daigneault had seen on television a few nights earlier.
At trial defendant attempted to show that Daigneault had mistaken him for a man named Louis Marchetti (Marchetti), who was a friend of both defendant and Meo. The night before the robbery Daigneault's daughter had seen two men outside the Daigneault home, whom she later identified as Meo and Marchetti. The Bargain Shed was located in close proximity to the Daigneault's home and it was suggested by defense counsel that the two men observed by Daigneault's daughter had been "casing" the site in preparation for the robbery which occurred the following night. The defendant also presented eight alibi witnesses who testified that defendant was attending an eighty-fifth birthday party for his grandmother in Providence on the night of November 22, 1988, at the time the robbery was committed.
The defendant was found guilty at a jury trial. He thereafter filed a motion for new trial on the ground that the verdict was against the weight of the evidence. This motion was supplemented with an additional claim that a new trial was required based on newly available evidence. The motion for new trial was denied on both grounds.
Approximately seven and one-half months after defendant was found guilty, defense counsel received sworn affidavits from two persons who were members of the jury at defendant's trial. The affidavits alleged that certain acts of juror misconduct had occurred during the course of the trial and as a result of this misconduct, information that had not been presented as evidence at trial was brought to the jury's attention. Upon learning that the jury had been exposed to extrajudicial information, defendant filed a second motion for new trial, claiming that such juror misconduct denied him his constitutional *957 right to a fair trial. The court found, however, that the juror affidavits contained "hearsay upon hearsay." It held that the affidavits did not constitute sufficient grounds for the court to conduct an evidentiary hearing nor were they sufficient to support the granting of a new trial. The second motion for new trial was therefore denied.
The defendant appeals the judgment of conviction and the denial of the two motions for new trial. In support of his appeal defendant raises five issues. We find it unnecessary to address each of defendant's claims of error because our finding with respect to the first issue renders consideration of the remaining issues premature. Additional facts will be furnished as needed to discuss the disposition of this issue.

DENIAL OF THE SECOND MOTION FOR NEW TRIAL
The two juror affidavits alleged that an unnamed juror had driven from defendant's grandmother's house in Providence to the scene of the robbery in Johnston and then back to the grandmother's house in Providence. The juror timed how long it took to drive this distance and reported to the rest of the jury that defendant would have had time to leave the party at his grandmother's house, drive to Johnston and commit the robbery, and then return to his grandmother's house in Providence all within the time that defendant had supposedly left the party to go to the store. We shall later refer to this alleged drive by the juror and the timing thereof as the "unauthorized view/experiment."
The defendant's grandmother testified at trial that one reason she remembered the circumstances of her eighty-fifth birthday party was that a pest extermination was supposed to have been performed at her apartment. She had prepared for the extermination by packing many of her possessions into boxes. She remembered being embarrassed that there were boxes all over the apartment during the party. The two juror affidavits alleged that the same juror who had conducted the unauthorized view/experiment also called the housing authority which is responsible for performing exterminations at the grandmother's apartment. This juror was told, and reported back to the rest of the jury, that the housing authority had no record of an extermination being performed at the grandmother's apartment, but that exterminations were usually performed on the first Friday of the month. One of the affidavits asserted that this information was contrary to the testimony elicited at trial.
One of the affidavits alleged that a different unnamed juror told the rest of the jury during deliberations that the composite picture of the suspect does not have to look like defendant in order for defendant to be guilty. This juror explained that his girlfriend had been robbed and that the composite picture of the suspect in that case did not look like the actual robber. The affidavit stated that the composite picture of the suspect introduced at defendant's trial "was identical to Louis Marchetti."
Yet another unnamed juror, according to the allegation in one of the affidavits, informed the jury that he had consulted with a policeman concerning the effects of mace and then reported his findings to the rest of the jury. The juror informed the jury that when mace is sprayed in a person's face and eyes the mace will have no effect unless the person rubs his or her eyes. He went on to tell the jury that once the person rubs his or her eyes the mace causes the eyes to burn, but if the person does not rub his or her eyes the eyes will not burn. The affidavit then states that if Daigneault did not rub her eyes that she could have seen perfectly, and that no evidence was presented at trial concerning the effects of mace on a person's skin or eyes.
One of the affidavits also reported the results of preliminary jury votes taken at the beginning and end of the first day of deliberations. This affidavit also claimed that the receipt of this extra-judicial information caused the affiant as well as at least one other juror to change their final votes from not guilty to guilty.
The defendant claims that the foregoing instances of juror misconduct completely undermined the verdict and substantially prejudiced his constitutional right to a fair trial. *958 He thus contends that the denial of his second motion for new trial was prejudicial error.
It is our opinion that the information contained in the two juror affidavits, in and of itself, is insufficient to order that defendant be granted a new trial. Initially we note that the trial justice was correct in his assessment of the affidavits as "hearsay upon hearsay." The affidavits themselves are hearsay and they contain statements allegedly made by other jurors who were not identified.
The Sixth Amendment to the United States Constitution guarantees a criminal defendant, inter alia, the right to counsel and the right to confront witnesses against him. Parker v. Gladden, 385 U.S. 363, 364, 87 S.Ct. 468, 470, 17 L.Ed.2d 420, 422 (1966). The constitution of the state of Rhode Island also guarantees a criminal defendant these same rights. R.I. Const. art. 1, sec. 10. When jurors consider evidence, in the form of either fact or opinion, that has not been presented at trial, a criminal defendant is denied the Sixth Amendment guarantees of confrontation, cross-examination, and assistance of counsel. See Parker, 385 U.S. at 364-65, 87 S.Ct. at 470, 17 L.Ed.2d at 422-23; United States v. Rowe, 906 F.2d 654, 656 (11th Cir.1990) (holding that exclusion of outside evidence is essential "because only evidence offered against the defendant at the witness stand in a public courtroom receives the judicial protection of the defendant's [S]ixth [A]mendment right of confrontation, cross-examination, and counsel") (citing Turner v. Louisiana, 379 U.S. 466, 472, 85 S.Ct. 546, 549, 13 L.Ed.2d 424, 428 (1965)). Even though the allegations of juror misconduct in the case at bar are contained in affidavits which themselves are inadmissible hearsay, further inquiry into the circumstances and conditions under which extraneous information may have been imparted to the jury is required to ensure that defendant's rights guaranteed by the Sixth Amendment to the United States Constitution and article 1, section 10, of the Rhode Island Constitution have not been abridged. At the same time, however, we recognize that because "it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote," that "due process does not require a new trial every time a juror has been placed in a potentially compromising situation." Smith v. Phillips, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78, 86 (1982). We therefore remand the case to the Superior Court to conduct an evidentiary hearing.
As this court stated over a century ago:
"The conduct of * * * jurors in * * * obtaining evidence for themselves * * * is wholly inexcusable and highly reprehensible. They were sworn to give a true verdict in the case, according to law and the evidence given them. This means, as everybody knows, that the case is to be tried and decided solely upon the law and the evidence as given in the court, or under its immediate direction, and `to permit them to take into consideration evidence not produced upon the trial, and without the knowledge or consent of either party, is subversive of all rules which govern the admissibility of testimony, and of the right of a fair and impartial trial by jury.'" Garside v. The Ladd Watch Case Co., 17 R.I. 691, 697, 24 A. 470, 473 (1892).
Garside was a civil case, but the above quoted passage applies with equal if not greater force to a criminal trial.
It is well settled Rhode Island law that the use of juror affidavits concerning what the jurors may have done either before or during their deliberations is impermissible to impeach the jury verdict. Palmigiano v. State, 120 R.I. 402, 407, 387 A.2d 1382, 1385 (1978). The rationale underlying this policy was stated in Palumbo v. Garrott, 95 R.I. 496, 188 A.2d 371 (1963):
"The public interest requires that litigation be terminated, and to this end jury verdicts should possess a conclusiveness that will preserve the stability of the jury trial as an instrument for doing substantial justice. To accept evidence for the purpose of impeaching such verdicts either from the jurors themselves or from others as to statements made by jurors would do substantial violence to the policy above enunciated." Id. at 502, 188 A.2d at 374.
*959 There are thus two competing policies that courts must seek to accommodate  a criminal defendant's right to be judged solely upon evidence presented in the courtroom, and the public interest in the finality of jury verdicts.
There is a recognized exception, however, to the rule prohibiting the use of juror affidavits concerning the jury's own conduct from being used to impeach the jury's verdict. Juror affidavits are admissible "for the sole purpose of demonstrating that matters not in evidence reached the jury through outside communications or media contacts." Palmigiano, 120 R.I. at 407, 387 A.2d at 1385. This exception is grounded in the fundamental principle that a jury's verdict should be based solely on the evidence presented in court.
The general rule governing the inquiry into the validity of a jury verdict was codified by Rule 606(b) of the Rhode Island Rules of Evidence which states:
"Inquiry Into the Validity of Verdict or Indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement [occurring] during the course of the jury's deliberations or to the effect of anything upon his or her or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may the juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes."
Rule 606(b) of the Rhode Island Rules of Evidence was modeled after, and is identical to, Rule 606(b) of the Federal Rules of Evidence except for minor syntactical changes. Communications between jurors and third parties where relevant to the case to be decided, and consideration by the jury of evidence not admitted in court are examples of extraneous information, the existence of which may properly be the subject of juror testimony. See, e.g., Government of Virgin Islands v. Gereau, 523 F.2d 140, 149, 150-51 (3d Cir.1975), cert. denied, 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976). Leaving aside for a moment the unauthorized view/experiment, we shall apply the foregoing law to the allegations contained in the two juror affidavits.
With respect to (1) the call to the housing authority, (2) the conversation with a police officer regarding the effects of mace, and (3) the conversation with a juror's girlfriend about composite pictures, the jurors who allegedly engaged in these conversations shall be permitted to testify as to whether such conversations actually occurred. If the court finds that any of the conversations did in fact take place, the juror that participated in the conversation may testify to its nature and concerning any information derived therefrom that was imparted to other members of the jury. The remaining jury members shall be permitted to testify with respect to whether any such extraneous information was conveyed to them, and if so, under what circumstances. They may also testify concerning the nature of the information received. No juror may testify regarding the deliberative process, including the effect that any extraneous information had on his or her decision to return a guilty verdict.

THE UNAUTHORIZED VIEW/EXPERIMENT
The defendant's brief and one of the two juror affidavits assert that there was testimony at trial that defendant had left his grandmother's party for a short period to go to the store. It was apparently in response to this supposed testimony that one of the jurors allegedly conducted the unauthorized view/experiment for the purpose of discovering whether defendant could have driven from the party to the scene of the crime, committed the robbery, and returned to the party all within the time that he was supposed to have been at the store. The state correctly points out in its brief, however, that there was never any testimony that defendant *960 left the party to go to the store. There was testimony that defendant's uncle and defendant's brother-in-law twice went to the store for refreshments, but there was never any testimony that defendant left the party to go to the store.
The advisory committee note accompanying Rule 606 points out that the question of whether a juror may testify with respect to an unauthorized juror view is troublesome in light of this court's prior jurisprudence in the area of juror impeachment of verdicts. In Phillips v. The Rhode Island Co., 32 R.I. 16, 78 A. 342 (1910), a case involving an unauthorized juror view, this court held that the "affidavits of jurors as to their own misconduct in or out of the juryroom during the trial are inadmissible to impeach their verdict." Id. at 27, 78 A. at 346; see also Bradshaw v. Campbell, 103 R.I. 319, 321, 237 A.2d 547, 549 (1968) (holding that the trial court correctly refused to admit two juror affidavits that alleged an unauthorized juror view and experiment). In State v. Lewis, 115 R.I. 217, 341 A.2d 744 (1975), juror testimony was permitted to establish that unauthorized and possibly prejudicial telephone conversations took place between jurors and outsiders. In Palmigiano, supra, the affidavit of an alternate juror was admissible to establish that newspaper articles relating to the case had improperly reached the jury during the trial.
We are mindful that each of the foregoing cases was decided well before the 1987 adoption of Rule 606 of the Rhode Island Rules of Evidence. After the rule's adoption, the question arose whether juror testimony regarding an unauthorized juror view should be admitted under the exception that allows juror testimony to show that extraneous prejudicial information was improperly brought to the jury's attention. The advisory committee note to Rule 606 opines that the better approach is to treat evidence of an unauthorized juror view as falling within the exception to the general rule excluding juror testimony for the purpose of impeaching the verdict. It suggests that when the policy behind Rule 606(b) is considered, it is difficult to distinguish between an unauthorized view and the receipt of unauthorized newspapers (Palmigiano) or unauthorized telephone conversations (Lewis).
We are in agreement with the advisory committee note to Rule 606 that juror testimony regarding unauthorized juror views falls within the exception specified in Rule 606(b).[1] Similarly, it is our belief that juror testimony regarding unauthorized juror "experiments" comes within the purview of the exception. Federal courts interpreting Federal Rule of Evidence 606(b) have also held that unauthorized juror views and "experiments" fall within the exception to the rule. See, e.g., In re Beverly Hills Fire Litigation, 695 F.2d 207, 213 (6th Cir.1982) (juror experiment is extraneous information), cert. denied, 461 U.S. 929, 103 S.Ct. 2090, 77 L.Ed.2d 300 (1983); United States v. Williams-Davis, 821 F. Supp. 727, 740 (D.D.C. 1993) (juror's unauthorized visit to crime scene is extraneous information). Even though such unauthorized views and experiments constitute extraneous information to which a juror may testify at an evidentiary hearing, there must also be a finding that the information prejudiced the moving party.
In the case at bar, the juror who allegedly conducted the unauthorized view/experiment shall thus be permitted to testify as to its occurrence. If the view/experiment did in fact occur, the juror may testify as to its attendant circumstances and regarding what findings she imparted to her fellow jurors. The other jurors may testify regarding the nature of the information conveyed to them and the circumstances under which they learned of the information. No juror may testify, however, regarding the effect that such information had on the deliberative process. While juror testimony regarding an unauthorized juror view/experiment will be allowed to show that extraneous information was brought to the jury's attention, a finding by the trial justice that such information did in fact reach the jury is not *961 in and of itself sufficient justification for a new trial. There must also be a determination by the trial justice that defendant was prejudiced by the jury's receipt of the extraneous information.
The state claims that even if juror testimony with respect to the unauthorized view/experiment is permitted, defendant could not have been prejudiced by the introduction of such evidence since there was never any testimony that he had left the party to go to the store. We disagree. Although there was no testimony that defendant ever left the party for a brief period, the alleged unauthorized view/experiment nevertheless had the potential to prejudice defendant's right to a fair trial. The misapprehension on the part of the juror who conducted the view/experiment that defendant had briefly left the party may have led other jurors to conclude that defendant had in fact left the party to commit the robbery.
The state similarly contends that defendant could not have been prejudiced by the jury's receipt of evidence with respect to either the phone call to the housing authority or the conversation with the police officer about the effects of mace. The state correctly points out that there was never any testimony concerning the exact date that the extermination was to be performed and therefore argues that there was nothing for the juror's investigation to contradict. Moreover, the state notes that the information from the housing authority that exterminations were usually performed on Fridays was consistent with the grandmother's testimony. With respect to the conversation about the effects of mace, the state claims that such information was entirely cumulative. It notes that the victim, Daigneault, testified that only her left eye was sprayed with mace and that it did not start to burn until after the robbery was over. She testified that her right eye was completely unaffected. The state points out that the mace had no effect on Daigneault's ability to see her assailants, and therefore argues that the information allegedly imparted to the jury concerning the effects of mace could not possibly have been prejudicial to defendant.
We disagree that evidence of these two conversations could not possibly have prejudiced defendant's right to a fair trial. We do not know and may not inquire as to the effect that such information may have had on the minds of jurors. Hearing this information from fellow jurors may have caused other jurors to misapprehend the testimony heard at trial to the detriment of defendant. The prejudicial effect of any of the foregoing information, if found to have been improperly brought to the attention of the jury, is to be considered by the trial justice at the evidentiary hearing.
If after hearing the jurors' testimony the trial justice is satisfied that extraneous information was improperly brought to the attention of the jury, he must then determine if such information prejudiced defendant's right to a fair trial. In making this determination, however, the trial justice may not consider the assertions contained in one of the juror affidavits stating that the extraneous information did indeed cause certain jurors to change their votes from not guilty to guilty. Moreover, the trial justice may not consider any statements contained in the two juror affidavits that discuss the jury's deliberative process, including the results of preliminary votes or the thoughts of any individual jurors.
Because jurors may testify only with respect to whether extraneous prejudicial information was improperly brought to their attention, and not as to how, or if, such information affected their thought process and thus the verdict, defendant asserts that he could never prove that the receipt of such extra-judicial information prejudiced his right to a fair trial. The defendant therefore claims that whenever a showing is made that extraneous information has improperly reached the jury, a rebuttable presumption of prejudice arises. This court has in the past assumed, without deciding, that such a presumption of prejudice arises, but has not specifically addressed that question. Lewis, 115 R.I. at 229 n. 7, 341 A.2d at 750 n. 7. Subsequently, however, we stated that a showing that extraneous information has improperly reached the jury is not sufficient reason to grant a new trial. We held that *962 "some showing must be made on the record that the applicant was prejudiced thereby." Palmigiano, 120 R.I. at 407, 387 A.2d at 1385.
We agree with defendant's contention that because a court may not inquire of a juror what effect extraneous information had on the deliberative process, a defendant can never objectively prove actual prejudice. We disagree, however, that a rebuttable presumption of prejudice therefore arises whenever it is shown that extraneous information has improperly been imparted to the jury. We feel that the proper method of determining the prejudicial effect of extraneous information is to consider the probable effect that such information would have on an average reasonable juror. If the extraneous information would probably influence the decision of an average reasonable juror, then the information is prejudicial and relief should be granted to the moving party. We believe that this approach fairly accommodates the conflicting policies of encouraging verdict finality and safeguarding a defendant's right to be judged solely on evidence presented at trial. The approach we adopt is similar to that adopted by a number of federal circuit courts of appeal for determining the effect of extraneous or "extra-record" information. See, e.g., Bibbins v. Dalsheim, 21 F.3d 13, 17 (2d Cir.1994) (court must make "an independent determination of whether knowledge of the extra-record information would have a substantial and injurious impact on the verdict of a reasonable jury"); United States v. Gilsenan, 949 F.2d 90, 95 (3d Cir.1991) (court must consider the probable effect of the allegedly prejudicial information on a hypothetical average juror), cert. denied, ___ U.S. ___, 112 S.Ct. 2971, 119 L.Ed.2d 590 (1992); United States v. Bowling, 900 F.2d 926, 935 (6th Cir.) (holding that a defendant must show that juror misconduct resulted in prejudice to his defense in order to be granted a new trial), cert. denied, 498 U.S. 837, 111 S.Ct. 109, 112 L.Ed.2d 79 (1990); United States v. Boylan, 898 F.2d 230, 262 (1st Cir.) (court must consider the probable effect of the allegedly prejudicial information on a hypothetical average juror), cert. denied, 498 U.S. 849, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990).
We recognize that a number of federal courts have adopted a less stringent test for determining the prejudicial nature of extraneous information. These courts have held that a defendant in a criminal case is entitled to a new trial if a reasonable possibility exists that the extraneous information influenced the jury's verdict. See, e.g., United States v. Sanchez-Sotelo, 8 F.3d 202, 212 (5th Cir.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1410, 128 L.Ed.2d 82 (1994); United States v. Navarro-Garcia, 926 F.2d 818, 821 (9th Cir.1991); United States v. Rowe, 906 F.2d 654, 656 (11th Cir.1990); United States v. Weisman, 736 F.2d 421, 424 (7th Cir.), cert denied, 469 U.S. 983, 105 S.Ct. 390, 83 L.Ed.2d 324 (1984). We agree with the criticism of this approach expressed by the Supreme Court of Iowa. That court has rejected the "reasonable possibility" of prejudice standard, explaining that such an approach impermissibly lowers the threshold at which a verdict must be set aside. State v. Sauls, 391 N.W.2d 239, 241 n. 2 (Iowa 1986); State v. Cullen, 357 (N.W.2d 24, 28 (Iowa 1984).
For the reasons stated the defendant's appeal is sustained in part, and the case is remanded to the Superior Court for an evidentiary hearing. If the trial justice determines that extraneous prejudicial information was improperly brought to the attention of the jury and that such extraneous information would probably influence the decision of an average reasonable juror, then the defendant shall be granted a new trial. If the trial justice finds otherwise, the motion for new trial may be denied, subject to further review by this court if the defendant should again exercise his right to appeal.
NOTES
[1] We thus answer the question specifically left open in State v. Drowne, 602 A.2d 540, 542 n. 1 (R.I. 1992).