**Supreme Court**

No. 2008-210-C.A.

(W3/07-44A)

State                                        :

    v.                                       :

Hiawatha Brown.                              :


NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                    :

v.                       :

Hiawatha Brown.          :


Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Indeglia, for the Court.**  Hiawatha Brown (Brown or defendant) appeals from a Superior Court judgment of conviction for simple assault and disorderly conduct.   Brown contends that the trial justice committed reversible error in refusing to (1) hold a posttrial evidentiary hearing to determine if the jury was racially biased or if certain juror misconduct had occurred; (2) permit the entire fifteen-member jury panel to deliberate; and (3) instruct the jury that the aggressive actions of the police could constitute a defense to the charge of disorderly conduct.  For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

**I**

**Facts and Travel**

On July 14, 2003, a confrontation between the Rhode Island State Police and several members of the Narragansett Indian Tribe (the Tribe) led to the arrest of seven tribal members, including Brown.[1]  That day, Brown was charged with one count of simple assault in violation of

---

[1] A full description of the events underlying the charges is set forth in State v. Thomas, 936 A.2d 1278, 1280 (R.I. 2007).  The confrontation spurred both the Tribe and the State of Rhode Island to file lawsuits in federal court to determine whether state officers acted with proper authority in enforcing state laws on the Tribe's property.  The United States Court of Appeals for the First Circuit ultimately resolved this litigation in the state's favor.  Narragansett Indian Tribe v. State of Rhode Island, 449 F.3d 16, 24 (1st Cir. 2006).

- 1 -

G.L. 1956 § 11-5-3 (count 1), one count of disorderly conduct in violation of G.L. 1956 § 11-45-1 (count 2), and one count of resisting arrest in violation of G.L. 1956 § 12-7-10 (count 3). The charges against Brown were based on behavior that allegedly included slamming a state trooper's arm in a door; pushing, choking, and being physically combative with other state troopers; and flailing his arms and legs as troopers attempted to place handcuffs on him.

Brown and his six codefendants were jointly tried in Superior Court over the course of several weeks in February and March of 2008.[2] In the remaining portion of Part I, we discuss only those facts relevant to the issues raised on appeal.

### A

### Jury Selection and Jury Instructions

Jury voir dire and selection began on February 25, 2008, and concluded two days later. Sixteen people were ultimately empaneled on the jury—the maximum number allowed under Rule 24(c) of the Superior Court Rules of Criminal Procedure. Out of the panel of sixteen, three jurors were minorities. One of the three became ill during the course of the trial and was discharged from jury service, leaving only two minorities on the fifteen-member panel.

Several weeks later, at the conclusion of the testimony, the trial justice delivered her instructions to the jury. She denied Brown's request for an instruction that "excessive force [on the state's part] would constitute an offense [sic]" to the charge of disorderly conduct.[3]

After the trial justice delivered her instructions, twelve of the fifteen jurors who heard the case were selected to deliberate. Before this process took place, Brown requested that all fifteen

---

[2] Brown and five of his codefendants were represented by two attorneys. Another codefendant was represented by a third attorney. For simplicity's sake, if Brown's counsel took an action on behalf of Brown and his codefendants, we shall describe that action as Brown's.

[3] We assume that Brown's counsel actually requested an instruction that excessive force would constitute a defense to the charge of disorderly conduct.

members of the jury be allowed to deliberate or, in the alternative, that the two individuals who were minorities be selected for the twelve-member panel. The state objected to both of these requests. Citing Rule 24(c), the trial justice ruled that she lacked the authority to either seat fifteen jurors without the state's acquiescence or to select those two individuals as members of the panel. Accordingly, she denied Brown's requests. Brown has indicated to this Court that "just one person of color" remained after the twelve-member panel was selected.

## B

## Jury Deliberations

The jury began its deliberations on April 1, 2008. On April 2, 2008, the second day of deliberations, the trial justice received three notes from the jury. The first note stated as follows:

> "I'm concerned about the progress of deliberations. We have one juror who has proclaimed she will not find any [d]efendant guilty, regardless of the evidence, because of the conduct [of] the [s]tate [p]olice. We heard this early on and have tried to convince her with regard to the laws we need to address, but she is unmovable. We have at least five charges we cannot agree upon. Any advice?"

Hours after the trial justice received this first note (to which neither she nor the parties responded), she received a second note in which the jury requested clarification on the issue of self-defense. The note also stated that the jury was "deadlocked on about [eleven] of the [sixteen] charges. Many tears. Much frustration."

After she received the second note, the trial justice called the jury back into the courtroom and gave them additional instructions concerning self-defense. Deliberations then resumed. Shortly thereafter, the jury sent the trial justice a third note. This note stated that the

jury was "hung on all charges. Complete impasse. No compromise." After giving the jury an Allen charge, the trial justice dismissed the jury for the day.[4]

The following day, on April 3, 2008, the trial justice met with counsel in chambers to read into the record the three notes she had received from the jury. She also explained that, on the previous day, one of the deputy sheriffs assigned to the jury had reported to her an incident that occurred as the jurors were leaving the jury room at the end of the day. That sheriff was brought into chambers, where he recounted the incident for the record. He "noticed three or four of the jurors lagg[ing] behind * * *. I observed them speaking. And the one I mainly observed was Juror 175. * * * [H]e was speaking about the case." The sheriff felt that Juror 175 was "lobbying his opinion." He told Juror 175 that jurors were not allowed to discuss the case outside of deliberations, when all twelve members were present. He said that Juror 175 "immediately threw up his hand and said, 'I'm sorry. I'm sorry.'" In response to the trial justice's inquiries, the sheriff explained that he concluded the jurors had been talking about the case based on "[t]heir mannerisms" and the fact that Juror 175 "was speaking [in a] low [manner]."

Based on the sheriff's observations, the trial justice interviewed several of the jurors, speaking with each individually in chambers in the presence of counsel.[5] Juror 245 denied that he and the other jurors whom the sheriff had observed were talking about the case; he said that they "were talking about motivations, about * * * where other people are coming from." Next, the trial justice interviewed Juror 141. She reported that, although she had been "frustrated" and

---

[4] "An Allen charge is '[a] supplemental jury instruction given by the court to encourage a deadlocked jury, after prolonged deliberations, to reach a verdict.'" State v. Gordon, 30 A.3d 636, 640 n.9 (R.I. 2011) (quoting State v. Vargas, 21 A.3d 347, 351 n.8 (R.I. 2011)).

[5] Although the jurors interviewed were identified by name on the record, we use only their juror numbers to protect their privacy.

"upset" by the process of deliberation, she had not talked with other jurors about the case or about any jurors in particular. The trial justice then spoke with Juror 175. He described the encounter the deputy sheriff had observed as "a couple of [jurors] * * * just expressing frustration." He also denied that they had been discussing the evidence or the substance of the case.

The trial justice then spoke separately with Jurors 171 and 112. Juror 171 said that some of the jurors were "very, very emotional, so [he kept] reassuring them that they have to go with their conscience, and have to do what they feel is right * * *." He also said that they had not been discussing the case itself. This juror also offered the somewhat cryptic comment that there were "conflicts of personalities [on the jury], but it's more of a visual thing rather than a spoken thing." Juror 112 had a hazy memory of the previous afternoon and said she did not remember discussing the case with anyone.

After defense counsel raised concerns about the remarks of Jurors 245 and 175, the trial justice then separately interviewed these two jurors a second time. Juror 175 stated that "when we sit down to deliberate and try to discuss and review the evidence, * * * right off the bat we have one or two people that [sic] come right out and said--." The trial justice cut him off mid-sentence to prevent him from disclosing specifics. Juror 175 also said that, during the encounter the deputy sheriff had observed on the previous day, none of the jurors had spoken of any other juror in particular when expressing frustration.

Juror 245 explained that, when the deputy sheriff observed the small group of jurors talking among themselves, they had been "discussing why people might not be open to thinking, * * *, why people might be so adamant about the positions that they have." Although none of

them referred to a specific juror or jurors, he said that "we probably said 'they' and probably knew who the other two jurors were."

Once the juror interviews had concluded, Brown moved for a mistrial, arguing that the deliberative process "ha[d] broken down." Brown also moved, in the alternative, for the removal of Juror 175. The state objected, pointing out that the jurors' private remarks indicated that they had simply been consoling one another after a difficult day of deliberations and that none of them had discussed the case itself outside of deliberations.

The trial justice concluded that the jurors' remarks provided no basis for a mistrial. Although she described Juror 175 as "brusk [sic]," she felt that "[h]e didn't say anything that would cause me to think that he had tainted the jury or [that] he was tainted." As for Juror 245, while the trial justice said she had some concerns about his remarks, she believed that he and the jurors with whom he had spoken had not been discussing the case. The trial justice pointed out that the sheriff had merely observed the jurors speaking with each other and had not heard what any of them said. She concluded by stating: "They seem[ed] to be venting some frustration and emotion on the way out the door. Is that enough to grant a mistrial? I don't think it is." The trial justice also denied Brown's motion to excuse Juror 175 for cause.

Thereafter, the trial justice called the entire jury into the courtroom and gave them what she called a "pep talk." She reiterated the elements of the charged offenses and the defenses that had been raised and encouraged the jury to reach a verdict. Deliberations resumed thereafter.[6]

---

[6] The following day, on April 4, 2008, the trial justice and counsel had a sidebar discussion concerning the implications of comments made to the press by one of the defense attorneys; those comments included details about the notes from the jury and the progress of the deliberations. Although this incident has no direct relevance to this appeal, we take this opportunity to remind all lawyers who practice in Rhode Island that such conduct is strictly prohibited. See Article V, Rule 3.6 of the Supreme Court Rules of Professional Conduct ("Trial publicity").

**C**

**Verdict and Motion for a New Trial**

On April 4, 2008, a jury convicted Brown of simple assault (count 1) and disorderly conduct (count 2). Brown was acquitted of resisting arrest (count 3).[7] On count 1, the trial justice sentenced Brown to a suspended jail term of one year with one year probation; she also ordered him to attend anger management counseling. On count 2, the trial justice sentenced Brown to a suspended jail term of six months with six months probation. Both sentences were concurrent with each other.

Of Brown's six codefendants, four were acquitted on all charges. Of the two remaining codefendants, one (Matthew Thomas) was convicted of simple assault and acquitted of disorderly conduct and resisting arrest; and one (Randy Noka) was convicted of disorderly conduct and acquitted of resisting arrest.

On May 7, 2008, about one month after the verdict was announced, Brown moved for a new trial pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure. Brown's motion stated that, following the trial, he had "uncovered evidence of juror misconduct that infected the jury deliberation process and violated [his] constitutional rights to a fair trial."[8] The motion was accompanied by affidavits from three jurors who had contacted Brown's counsel after the trial concluded. Those affidavits described conduct that, according to Brown, "compel[led] a hearing as to whether any juror * * * harbored a prohibited animus towards

---

[7] The state's brief inaccurately states that Brown was acquitted of disorderly conduct. Counsel for the state acknowledged at oral argument that Brown was indeed convicted on this charge, as is apparent from our review of the record.

[8] Rule 33 of the Superior Court Rules of Criminal Procedure allows a defendant to move for a new trial "based on newly discovered evidence * * * within three (3) years after the entry of judgment * * *." Earlier, Brown had also moved for a new trial based on the sufficiency of the evidence against him. Because he has not appealed that aspect of the trial justice's decision, we do not discuss it here.

[Brown and his codefendants]." Because the affidavits are central to Brown's argument on appeal, we review them in detail.

The first affidavit was from a juror to whom we refer as Juror A. She identified herself as "the lone minority juror" and stated that she was "deeply concerned about the bias and conduct" of two other jurors. In her view, those two jurors—to whom we refer as Juror 1 and Juror 2—"appeared to have a joint agenda." Juror A averred that the foreperson had sent a note to the trial justice without input or approval from other jurors. Juror A was referring to the note sent by the foreperson on April 2, 2008, which reported concerns about a juror who would not consider convicting any of the defendants. Juror A also detailed two incidents on which Jurors 1 and 2 displayed what she viewed as bias toward Brown and his codefendants. First, observing Brown and his codefendants stand when Matthew Thomas (the Tribe's Chief Sachem) testified at trial, Juror 1 remarked, "Why did they stand up? He's nothing." Additionally, Juror 2 stated during deliberations, "Who are those people to touch a police officer?"

The second affidavit was from a juror to whom we refer as Juror B. Juror B stated that she believed Jurors 1 and 2 had discussed the case outside of deliberations. She admitted that she had not heard them discuss the case outside of the presence of other jurors, but stated that her opinion was "base[d] * * * on [her] own personal observations of their conduct." Juror B also stated that Juror 2 had referred to the defendants as "those people" when, during deliberations, Juror 2 commented that one should never touch a police officer. Juror B also averred that "[w]hen [the jury] finally reached a verdict * * * [Juror 2] banged two water bottles together like

- 8 -

he was playing a tom-tom drum."[9] As had Juror A, Juror B stated that she was not consulted before the foreperson sent the first note to the trial justice on April 2, 2008.

The third affidavit was from a juror to whom we refer as Juror C. He stated his opinion that Jurors 1 and 2 had displayed a "disrespectful attitude toward the defendants," but "never used any racial epithets." He also recalled that Juror 2 had "bang[ed] two water bottles in a 'tom-tom' cadence" and stated that he "thought this was very disrespectful." Although Juror C "never actually heard" Jurors 1 and 2 speaking about the case, he stated that he "[found] it hard to believe that they did not discuss the case out of the presence of the other jurors." He also stated that the jury "did not discuss the contents of the first note that the foreperson sent" to the trial justice.

On June 17, 2008, a hearing was held on Brown's motion for a new trial. The trial justice identified the pertinent issue as "whether or not any evidentiary hearing is needed * * *." Brown's counsel contended that the affidavits contained "comments that could be determined to be racially motivated * * *." He argued that the affidavits constituted evidence of juror misconduct and bias, and he suggested that the trial justice should hold an evidentiary hearing on this subject.

In response, the prosecutor urged the trial justice to deny Brown's motion for a new trial, characterizing it as "based upon speculation" and "interpretations of other people's conduct." She argued that, because the affidavits did not demonstrate that extraneous information invaded the jury's deliberations, the court could not consider them as evidence under Rule 606(b) of the

---

[9] A "tom-tom" is defined as "(1) Any of various small-headed drums, usually long and narrow, that are beaten with the hands. (2) A gong having a metal disk struck with a felt-covered hammer or stick. (3) A monotonous rhythmical drumbeat or similar sound." The American Heritage Dictionary of the English Language 1818 (4th ed. 2009).

Rhode Island Rules of Evidence.[10] In her view, neither the alleged references to "those people" nor the tom-tom cadence allegedly played on the water bottles constituted evidence of racial bias. She also pointed out that none of the affidavits suggested that jurors had used racial epithets in describing the defendants.

In a thorough and well-reasoned decision from the bench, the trial justice denied Brown's motion for a new trial. She first commented that "[t]he fundamental goal of a trial justice is to ensure a fair and impartial trial for the defendants." She explained that the allegations of juror misconduct set forth in Brown's motion fell into three distinct categories. The first category comprised "alliances between jurors * * *, verbal fights between the jurors, * * * personality differences, demeaning references, [and] insulting behavior." The second category consisted of "conversations * * * between jurors, outside the presence of other jurors during the deliberations." The third and final category encompassed "any suggestion of any racial bias or motivation."

The trial justice analyzed the first two categories of allegations in light of Rule 606(b). Relying on precedent from this Court, the trial justice found that the affidavits did not indicate that the jurors considered anything other than the evidence presented at trial. Although the affidavits suggested that some jurors had conversations outside the presence of the full jury, she

---

[10] Rule 606(b) of the Rhode Island Rules of Evidence states as follows:
"Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement [occurring] during the course of the jury's deliberations or to the effect of anything upon his or her or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith * * *. Nor may the juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes."

found that "no one heard anyone say anything specific." Even assuming the truth of the affidavits, she found that they contained nothing more than "assumptions or speculations." Accordingly, ruling on the first and second categories of juror misconduct, the trial justice denied Brown's motion for a new trial or for an evidentiary hearing.

The trial justice next considered whether the affidavits supported Brown's contention that a new trial or an evidentiary hearing should be granted because racial bias infected the jury's deliberative process. At the outset, she stated that Rule 606(b) would not constrain her decision on this issue. She recognized that "the importance of jury secrecy might, on the rarest of occasions, be outweighed by [the] consideration of fundamental fairness to [a] defendant."

The trial justice also noted that this Court's precedent provided little guidance on the issue of whether the affidavits constituted a sufficient showing of racial bias to warrant an evidentiary hearing. She reviewed a number of cases from other jurisdictions that had informed her decision. After indicating that she had given "extraordinary consideration" to the statements contained in the affidavits, the trial justice characterized them as "impressions or opinions or conclusions based on conduct that [she considered] to be ambiguous." She found that none of the jurors had made clear statements evidencing racial bias; rather, the affidavits demonstrated statements or conduct that was "ambiguous," "innocuous," and "capable of different interpretations." Accordingly, the trial justice denied Brown's motion for a new trial or for an evidentiary hearing with respect to the allegations of juror bias.

Final judgment entered on July 29, 2008. Thereafter, defendant timely appealed to this Court.[11]

---

[11] Although Brown's notice of appeal was filed prematurely, we treat such a filing as timely. State v. Lamoureux, 58 A.3d 189, 192 n.4 (R.I. 2013).

- 11 -

## II

## Issues on Appeal

Brown raises three issues on appeal to this Court. His primary argument is that the trial justice should have conducted an evidentiary hearing to ensure that racial bias had not pervaded the jury's deliberative process. Brown disagrees with the trial justice's conclusion that, absent a more substantial showing of racial bias, she did not have the authority to hold such a hearing. Second, he contends that the trial justice erred in denying his request that all fifteen jurors who heard the evidence be seated on the deliberating panel. In this regard, Brown also faults the trial justice for not requiring the prosecution to offer a race-neutral reason for refusing to seat more than twelve jurors. Lastly, he argues that the trial justice erred in refusing to instruct the jury that it could find him not guilty of disorderly conduct if it found that the state police had initiated the disturbance.

## III

## Discussion

## A

## Allegations of Juror Misconduct

We agree with the trial justice that the allegations of juror misconduct contained within the affidavits fall into distinct categories. Although she separated the allegations into three categories, we think it proper to divide them into two: those alleging racial bias and those alleging misconduct of a different nature. We analyze both categories in turn.

**1**

**Racial Bias**

The starting point for our analysis of this issue is Rule 606(b), which erects a nearly impregnable fortress around the jury's deliberative process.[12] That fortress, however, can be breached in some situations. "[A] juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." Rule 606(b).

We have identified Rule 606(b)'s "underlying public policies" as "providing for the termination of litigation and * * * ensuring that jury verdicts 'possess a conclusiveness that will preserve the stability of the jury trial as an instrument for doing substantial justice.'" State v. Drowne, 602 A.2d 540, 543 (R.I. 1992) (quoting Palumbo v. Garrott, 95 R.I. 496, 502, 188 A.2d 371, 374 (1963)). However, we have also recognized that these policies may sometimes conflict with "a criminal defendant's right to be judged solely upon evidence presented in the courtroom * * *." State v. Hartley, 656 A.2d 954, 959 (R.I. 1995).

There are but a handful of Rhode Island cases citing Rule 606(b), and only some of them are helpful to our determination of whether racial bias can be considered "extraneous prejudicial information" or an "outside influence"—an issue of first impression in this Court. In Drowne, the trial court conducted a hearing to interview a juror who had given an equivocal response during a poll of the jury. Drowne, 602 A.2d at 541-542. Citing Rule 606(b), we held that the juror's testimony could not be used to impeach the defendant's verdict because it "reveal[ed] an explanation of [her] deliberative process and the factors she considered in reaching a guilty verdict. This explanation is the exact testimony that Rule 606(b) prohibits * * *." Drowne, 602

---

[12] The full text of this rule appears in footnote 11 of this opinion. See part I-C, supra.

A.2d at 543. We noted that the record "reflect[ed] no evidence that any juror received an unauthorized prejudicial communication or that any outside influence was improperly exerted on a juror." Id.

Three years after deciding Drowne, this Court considered for the first time whether affidavits alleging juror misconduct could be used to impeach the verdict in a criminal case. Hartley, 656 A.2d at 957-62. In that case, the juror affidavits alleged multiple acts of misconduct committed by several different jurors.[13] Id. at 957. We remanded the matter for an evidentiary hearing on the defendant's motion for a new trial, holding that jurors could testify at that hearing about the alleged acts of misconduct, but could not testify "regarding the deliberative process, including the effect that any extraneous information had on his or her decision to return a guilty verdict." Id. at 959, 962.

Two cases decided after Hartley centered on allegations of juror misconduct that fell within the embrace of Rule 606(b). One case involved an allegation that a juror had visited the scene of the crime during the course of the trial and had told the other jurors that she had "observe[d] the layout of the store and the location of the surveillance cameras." State v. Rodriquez, 694 A.2d 1202, 1203 (R.I. 1997). Another case involved a juror who had allegedly "brought toy cars into the deliberations as a visual aid" and "read aloud calculations, possibly based on his son's driver's training handbook, estimating braking distances of automobiles at certain speeds." Amphavannasouk v. Simoneau, 861 A.2d 451, 452 (R.I. 2004).

---

[13] One juror had conducted what the Court termed an "unauthorized view/experiment;" he also investigated the defendant's primary alibi witness. State v. Hartley, 656 A.2d 954, 957 (R.I. 1995). Another juror had offered comments during deliberations based upon his girlfriend's experience as the victim of a robbery. Id. Yet another juror had asked a police officer about the effects of mace and shared his findings with the rest of the jury. Id.

This review of our precedent shows that we have never before been asked to identify racial bias as the sort of "extraneous prejudicial information" or "outside influence" contemplated by Rule 606(b). We therefore look to federal caselaw to aid our determination of this issue. Cf. Hartley, 656 A.2d at 959 ("Rule 606(b) of the Rhode Island Rules of Evidence was modeled after, and is identical to, Rule 606(b) of the Federal Rules of Evidence except for minor syntactical changes.").

In deciding this issue, two federal appellate courts have concluded that Rule 606(b) precludes the admission of juror testimony regarding alleged racial bias to impeach a verdict. See United States v. Villar, 586 F.3d 76, 84 (1st Cir. 2009); United States v. Benally, 546 F.3d 1230, 1236 (10th Cir. 2008). The Villar and Benally courts disagreed, however, on whether the Sixth Amendment might require the admission of such testimony. The Tenth Circuit explained that certain "'aspects of the trial process' * * * serve to protect [a] defendant's Sixth Amendment right [to a fair trial] without breaching the ban on post-verdict juror testimony." Benally, 546 F.3d at 1240 (quoting Tanner v. United States, 483 U.S. 107, 127 (1987)). It identified those protections as "voir dire, observation of the jury during court, reports by jurors of inappropriate behavior before they render a verdict, and post-verdict impeachment by evidence other than juror testimony." Id. (citing Tanner, 483 U.S. at 127). The Benally court also described "jury perfection" as "an untenable goal." Id.

In contrast, the First Circuit held that those aspects of the trial process "do not provide adequate safeguards in the context of racially and ethnically biased comments made during deliberations." Villar, 586 F.3d at 87. While "emphasiz[ing] that not every stray or isolated off-base statement made during deliberations requires a hearing at which jury testimony is taken[,]" it held that "certain rare and exceptional cases involving racial or ethnic prejudice * * * require

- 15 -

hearing jury testimony to determine whether a defendant received a fair trial under the Sixth Amendment." Id. at 87, 88.

Consistent with the First and Tenth Circuits, we hold that a juror's racial bias is not "extraneous prejudicial information" or an "outside influence" within the embrace of Rule 606(b). However, we agree with the Villar court that Rule 606(b) does not preclude the admission of such testimony where necessary to protect a defendant's right to a fair trial by an impartial jury—a right guaranteed by the federal and state constitutions. See U.S. Const. Amend. VI; R.I. Const. art. I, sec. 10. "The determination of whether an inquiry is necessary to vindicate a criminally accused's constitutional due process and Sixth Amendment rights is best made by the trial judge, who is most familiar with the strength of the evidence and best able to determine the probability of prejudice * * *." Villar, 586 F.3d at 88. This narrow and focused inquiry must not violate Rule 606(b)'s prohibition against the admission of evidence regarding the jury's deliberative process. See Hartley, 656 A.2d at 959. We now proceed to consider whether the trial justice correctly decided that such a hearing was unnecessary in this case.

Two aspects of this prosecution are central to our conclusion that the trial justice correctly decided that Brown's allegations of juror bias did not warrant an evidentiary hearing. The first is that the jury returned a mix of convictions and acquittals against Brown and his six codefendants, all of whom were members of the Tribe. Each of the defendants was acquitted on at least one charge, and a majority of the defendants were acquitted on all charges. The second is that the jury returned a mix of convictions and acquittals against Brown himself. Taken together, these facts belie his argument that the jury was biased against him. They demonstrate that, as they were instructed to do, the jury carefully considered the evidence on each charge against

each defendant. The essence of Brown's primary argument on appeal is that he was convicted because of his race, but the verdict itself discounts this contention.

The allegations of racial bias in the affidavits amounted to the following conduct: (1) Juror 1's statement that the Tribe's Chief Sachem was "nothing"; (2) Juror 2's use of the term "those people" in describing Brown and his codefendants; and (3) Juror 2's act of banging water bottles like tom-tom drums. As did the trial justice, we conclude that none of these three statements or acts is overtly racist. Juror 1's comment that the Chief Sachem was "nothing" may have been impolite; but, as the trial justice noted, it was made after defendants stood up when he took the stand—an act that was certainly out of the ordinary.[14] Juror 2's use of the term "those people" can be understood as an acceptance of the state's argument that defendants had no legal entitlement to lay hands on the officers during the smokeshop confrontation. We agree with the trial justice's finding that this comment did not necessarily have a racist undertone. Finally, we admit some confusion (as did the trial justice) over the allegation regarding Juror 2's act of banging water bottles like tom-tom drums. We think the trial justice was correct in describing this behavior as "ambiguous," "innocuous," and "capable of different interpretations."

Moreover, the trial justice correctly characterized the allegations of racial bias contained within the affidavits as speculative. According to the affiants, none of the jurors uttered racial slurs, and none explicitly or implicitly suggested that Brown's racial or ethnic background should factor into the jury's decision-making process. These facts distinguish this case from others to which the parties have cited both before the Superior Court and before this Court. See, e.g., Villar, 586 F.3d at 81 (where defendant was of Hispanic descent, one juror reported that

---

[14] The trial justice reminded the parties that she had asked counsel if they wanted her to issue an instruction to the jury regarding this behavior. They declined this offer. In doing so, said the trial justice, "they took the risk that the jury [would] not agree with that [behavior], and that's normal."

another had stated, "I guess we're profiling but they cause all the trouble"); Benally, 546 F.3d at 1231 (foreman allegedly stated that "[w]hen Indians get alcohol, they all get drunk"); Commonwealth v. Laguer, 571 N.E.2d 371, 375 (Mass. 1991) (affidavit reported that a juror had made several statements in which he referred to the defendant using a racial slur).

We perceive no error in the trial justice's conclusion that it was unnecessary to hold an evidentiary hearing to preserve Brown's constitutional rights. Next, we consider whether the trial justice erred in likewise concluding that other alleged juror misconduct warranted neither a new trial nor an evidentiary hearing.

**2**

**Other Alleged Misconduct**

The non-race-related juror misconduct alleged in the affidavits consisted of (1) the foreperson's sending a note to the trial justice without the knowledge or approval of the entire jury panel; and (2) Jurors 1 and 2 discussing the case outside of deliberations. We hold that the trial justice properly denied Brown's motion for a new trial or an evidentiary hearing based on that alleged misconduct. She recognized that her discretion on this issue was circumscribed by Rule 606(b), and she found that the affidavits did not indicate that the jury had considered extrinsic evidence. She stated that the affiants had alleged only "speculation[s]" and "assumption[s] based on behavior." Regarding the note, the trial justice indicated that she had ignored it and that Brown had made no motion in response. She refused to "invade the jury deliberation process * * * by considering or accepting any testimony either by evidentiary hearing or affidavits regarding this jury process." Because this conclusion is consistent with precedent from this Court and the United States Supreme Court, we affirm her decision on this issue. See Moynihan v. Yetra, 648 A.2d 1361, 1363 (R.I. 1994) ("[J]urors' affidavits when

- 18 -

offered to prove what any of the jurors may have done either before or during their deliberations cannot be used to impeach their verdict.") (quoting Roberts v. Kettelle, 116 R.I. 283, 299, 356 A.2d 207, 217 (1976)); see also Tanner, 483 U.S. at 127 ("[L]ong-recognized and very substantial concerns support the protection of jury deliberations from intrusive inquiry.").

**B**

**Selection of Deliberating Panel**

We next consider whether the trial justice erred in denying Brown's request that all fifteen jurors who heard the evidence be seated on the deliberating panel. Brown also ascribes error to her failure to require the prosecution to offer a race-neutral reason for refusing to seat more than twelve jurors. Our conclusion on this issue is guided by Rule 24(c) of the Superior Court Rules of Criminal Procedure, which provides in pertinent part as follows:

> "If more than [twelve jurors] remain at the conclusion of the court's charge, the clerk in the presence of the court and the parties shall put the names of the remaining jurors in a box and from it shall draw twelve (12) names, or such other number stipulated to by the parties, to determine the issues." (Emphasis added.)

The rule is clear: no more than twelve jurors may be seated unless both parties agree. Because jury verdicts must be unanimous under Rule 31(a) of the Superior Court Rules of Criminal Procedure, and because the state bears the burden of proof in criminal cases, it is unsurprising that the prosecution refused to stipulate to the seating of more than twelve jurors on the deliberating panel. See State v. Stallman, 78 R.I. 90, 93, 79 A.2d 611, 612 (1951) ("[T]he state always has the burden of establishing [a defendant's] guilt beyond a reasonable doubt * * *."). Furthermore, this Court has held that a criminal defendant does not possess "the right to be tried by any particular juror." State v. McDowell, 685 A.2d 252, 255 (R.I. 1996). Accordingly,

- 19 -

we discern no error in the trial justice's conclusion that she had no authority, absent the prosecution's agreement, to seat more than twelve jurors on the deliberating panel.

We must also reject Brown's argument that Rule 24(c) unconstitutionally operates to exclude minorities from the deliberating panel. This rule is color-blind. It does not discriminate between minorities and nonminorities; rather, it simply operates to whittle the deliberating panel down to twelve people if alternate jurors have been empaneled. Because improper race-based decisions may be made during the initial jury selection process, the United States Supreme Court has established a procedure aimed at preserving a litigant's constitutional right to equal protection. See Batson v. Kentucky, 476 U.S. 79, 96-98 (1986); see also State v. Pona, 926 A.2d 592, 601-05 (R.I. 2007) (discussing Batson and its progeny). By contrast, the completely random process of selecting twelve names from a box requires no safeguards against discrimination. In our view, the trial justice did not err in declining to require the prosecution to proffer race-neutral reasons for refusing to stipulate to a deliberating panel of greater than twelve jurors.

## C

### Jury Instructions

Finally, we consider whether the trial justice erred in refusing to instruct the jury that it could find Brown not guilty of disorderly conduct if it found that the state police had initiated the disturbance. We review de novo a defendant's request for specific jury instructions. State v. Ricci, 54 A.3d 965, 971 (R.I. 2012). "Pursuant to G.L. 1956 § 8-2-38, 'we determine whether the jury charge sufficiently addresses the requested instructions and correctly states the applicable law.'" State v. Ros, 973 A.2d 1148, 1166 (R.I. 2009) (quoting State v. Graham, 941 A.2d 848, 855 (R.I. 2008)). If a trial justice declines to issue a specific instruction that is "fairly

covered in the general charge," we will leave this ruling undisturbed. <u>Ricci</u>, 54 A.3d at 971 (quoting <u>State v. Price</u>, 706 A.2d 929, 934 (R.I. 1998)).

Our review of Rhode Island law reveals no cases that support Brown's argument. Indeed, Brown has mustered only one case in support of his argument on this issue: a 1957 decision from a County Court of New York. <u>See</u> <u>People v. Jerome</u>, 168 N.Y.S.2d 452 (County Ct. 1957). In that case, the court reversed the defendant's conviction for disorderly conduct because the charge was based upon his conduct in defending himself against an unlawful arrest. <u>Id.</u> at 457. Here, by contrast, Brown was lawfully arrested. Because our precedent does not suggest that provocation on the state's part could constitute a defense to disorderly conduct, the trial justice's failure to issue an instruction to that effect is not reversible error. Accordingly, we affirm her ruling with respect to the requested instruction.

## IV

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court, to which we remand the record in this case.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**


*Clerk's Office Order/Opinion Cover Sheet*


**TITLE OF CASE:**        State v. Hiawatha Brown.

**CASE NO:**        No. 2008-210-C.A.
                                    (W3/07-44A)

**COURT:**        Supreme Court

**DATE OPINION FILED:**  April 5, 2013

**JUSTICES:**        Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia JJ.

**WRITTEN BY:**        Associate Justice Gilbert V. Indeglia

**SOURCE OF APPEAL:**    Washington County Superior Court

**JUDGE FROM LOWER COURT**:

                                    Associate Justice Susan E. McGuirl

**ATTORNEYS ON APPEAL:**

                                    For State:  Aaron L. Weisman
                                                        Department of Attorney General

                                    For Defendant:  William P. Devereaux, Esq.